[L. A. No. 8528. In Bank.—July 29, 1925.]

DOMINGUEZ LAND CORPORATION (a Corporation), Petitioner, v. EDWIN M. DAUGHERTY, Commissioner of Corporations, etc., Respondent.

[1] CORPORATIONS—REDUCTION OF CAPITAL STOCK—SURPLUS CAPITAL.— Where a corporation, by proceedings duly had under section 359 of the Civil Code, reduces its capital stock, the amount by which the capital stock is thus reduced is properly carried in the surplus capital account, as it represents a surplus of capital.

[2] ID.—DIVIDENDS FROM OTHER THAN SURPLUS PROFITS—JURISDICTION OF CORPORATION COMMISSIONER.—It is a reasonable inference from the provisions of the Corporate Securities Act that the legislature intended that the commissioner of corporations should give his permission to make dividends from other than surplus profits only when he should find that, if the dividends were made, the corporation would still be left in a sound financial condition—a financial condition that would be safe for the interests of the creditors as well as of the stockholders.

[3] ID.—CAPITAL STOCK—CONSIDERATION FOR ISSUED STOCK—SUBSEQUENT TRANSMUTATIONS.—The "capital stock" of a corporation, in the strict sense of the term, consists of the consideration which section 11 of article XII of the state constitution requires to be received in exchange for all issued stock—whether that considera-

tion take the form of money paid, labor done or property actually received; and it includes all subsequent transmutations of the consideration originally given or agreed to be given for the stock.

[4] Id.—Contribution by Corporators—Capital—Capital Stock—Right to Withdraw—Constitutional Law.—The word "capital" applied to corporations is often used interchangeably with the words "capital stock," and both are frequently used to express the same thing—the property and assets of the corporation; but, strictly speaking, the capital stock of a corporation is the money contributed by the corporators to the capital, and is usually represented by shares issued to subscribers to the stock on the initiation of the corporate enterprise, and it is only the capital stock in this strict sense of the term, and not the other capital or assets of the corporation, which may not be withdrawn or divided without indirectly frustrating the purpose of section 11 of article XII of the constitution—assuming, without deciding, that the withdrawal or distribution of any of the capital stock would be tantamount to an indirect violation of that provision of our organic law.

[5] Id.—Dividends from Other Than Surplus Profits—Distribution of Surplus Capital—Constitutional Law.—The provision of section 309 of the Civil Code which, in effect, permits dividends to be made from other than surplus profits if authorized by the commissioner of corporations does not violate section 11 of article XII of the state constitution, in so far at least as it is sought to apply the permissive provisions of that code section to the distribution by a corporation to its stockholders of surplus capital resulting from assessments levied and collected upon stock which was wholly paid for at its par value.

[6] Id.—Trust Fund Doctrine—Equity—Assets Affected.—The "trust fund doctrine" is based upon the idea that, as to creditors without notice of the circumstances under which the stock of a corporation was subscribed, the corporation is conclusively presumed to have sought credit upon its subscribed capital stock at its par value, either actually paid in or due from stockholders, and that unpaid subscriptions are assets to which corporate creditors may look for payment, and that they have the right to insist upon their collection, the same as any other debt due the corporation; but such doctrine has no application to surplus capital resulting from assessments levied and collected upon stock which was wholly paid for at its par value.

[7] Id.—Solvent Concern—Application of Trust Fund Doctrine.—The assets of a corporation to which the so-called "trust fund doctrine" is applicable are not charged with any enforceable trust or with any equitable lien on behalf of any general creditor of the

6.   See 7 R. C. L. 198.

corporation, if it be a solvent, going concern; and such creditors have no vested right of any nature whatever in or to the property of such a corporation.

[8] ID.—WHEN TRUST ARISES IN FAVOR OF CREDITORS—EQUITY.—It is only when a corporation is dissolved or is insolvent that a "trust," *sub modo,* arises in favor of creditors, and it is then that a court of equity, at the instance of the proper parties, will make those funds trust funds which, in other circumstances, are as much the absolute property of the corporation as any man's property is his.

[9] ID.—DISTRIBUTION OF SURPLUS—RIGHTS OF CREDITORS—NOTICE.— Since surplus capital of a corporation resulting from assessments levied and collected upon stock, which was wholly paid for at its par value is not impressed with any "trust" in favor of creditors of the corporation, and such creditors have no vested right therein, they are not deprived of any property without due process of law merely because the statute has made no provision for notice to them of the corporation's application for a permit to divide such surplus capital among the stockholders; and, therefore, notice to and a hearing by the creditors are not indispensable prerequisite under such circumstances.

[10] APPEAL—ORIGINAL JURISDICTION—FAILURE TO PRESENT POINT.— Ordinarily, an appellant who has neglected to present a point in his brief may be precluded from insisting that the court consider the matter when deciding the case, but even on appeal this is not a hard-and-fast rule; and where the appellate court is asked to issue its writ as a court of original jurisdiction, that rule should not apply, and the court should not issue its writ in any case if it believes there is good reason why it should not issue, regardless of whether that reason is or is not called to its attention by the defendant in the proceeding.

[11] CORPORATIONS — FUNCTION OF CORPORATION COMMISSIONER — JUDICIAL POWER.—The power which section 309 of the Civil Code confers upon the commissioner of corporations is not a judicial power of a character which may not be delegated, but is a ministerial or administrative function, though it involves in some degree an exercise of judgment and discretion.

[12] ID.—LEGISLATIVE FUNCTIONS—POWERS OF ADMINISTRATIVE OFFICER.—The legislature may commit to an administrative officer the power to determine whether the facts of a particular case bring it within a rule or standard previously established by the legislature for his governance; but, if no standard by which the officer is to be governed be prescribed by the lawmakers, then there is an attempt to entrust a mere administrative officer with the plenary power of the legislature.

12.    See 6 R. C. L. 165.

[13] Id.—Dividends from Other Than Profits—Function of Legis-
lature — Prescribed Standard — Safe Financial Condition. —
When the provision of section 309 of the Civil Code authorizing the
commissioner of corporations to permit corporations to make divi-
dends out of other than surplus profits arising from the business
thereof is read in connection with and in the light of the Corporate
Securities Act, it is clear that there has been no attempt to dele-
gate legislative power to the commissioner in violation of the
principle that the law-making function is assigned exclusively to
the legislature, but that the legislature has prescribed a standard
for the guidance of the commissioner in the matter, i. e., the
commissioner must consider whether the action he is asked to sanc-
tion will leave the corporation in a safe financial condition.

(1) 14 C. J., p. 501, n. 30.   (2) 37 C. J., p. 242, n. 87.   (3) 14
C. J., p. 379, n. 91.   (4) 14 C. J., p. 380, n. 94, p. 381, n. 11, p. 495,
n. 65.   (5) 14 C. J., p. 806, n. 25.   (6) 14 C. J., p. 951, n. 7, 12.
(7) 14 C. J., p. 951, n. 10.   (8) 14 C. J., p. 951, n. 11.   (9) 12
C. J., p. 1273, n. 24.   (10) 4 C. J., p. 1068, n. 22; 38 C. J., p. 919,
n. 26.   (11) 12 C. J., p. 902, n. 34.   (12) 12 C. J., p. 847, n. 1, 2.
.(13) 12 C. J., p. 847, n. 2.

PROCEEDING in Mandamus to compel the Commissioner
of Corporations to consider and act upon petitioner's appli-
cation to distribute surplus capital to its stockholders. Writ
granted.

The facts are stated in the opinion of the court.

James S. Bennett for Petitioner.

U. S. Webb, Attorney-General, Robert W. Harrison, Chief
Deputy Attorney-General, and H. H. Linney, Deputy At-
torney-General, for Respondent.

RICHARDS, J.—The application for a writ of mandate
herein presents a companion case to that of *Dominguez Land
Corp.* v. *Daugherty, ante,* p. 453 [238 Pac. 697], for the
reason that while the facts in the two proceedings differ,
the same general principles of law are applicable to both.
Because of the said differences as to the facts, requiring a
somewhat different treatment and application of the legal
principles involved in both cases, we have adopted that por-
tion of the opinion of Mr. Presiding Justice Finlayson of
the district court of appeal which we deem applicable to

the case in its present situation and apposite to it in the presence of our reasoning and conclusions in the other proceeding. It is as follows:

"This is an original proceeding in *mandamus* to compel respondent, as commissioner of corporations, to assume jurisdiction of a written application by petitioner for permission to distribute to its shareholders the sum of $185,000.00. This sum does not represent surplus profits. Petitioner made its application to respondent under the provisions of section 309 of the Civil Code.

"The petition discloses the following facts: Petitioner was incorporated under the laws of this state in 1912, with a capital stock of $2,000,000, divided into 20,000 shares of the par value of $100 each. Shortly after its organization all of its stock was issued in exchange for property which, according to an appraisement thereafter made, had a value which exceeded by $1,222,187.07 the par value of the stock. Subsequently the corporation, for the purpose of paying its debts and developing its properties, levied and collected, from time to time, assessments upon the stock so issued by it. On these assessments it collected from its shareholders amounts which aggregated $835,000. Thereafter, by proceedings duly had under section 359 of the Civil Code, petitioner reduced its capital stock to $1,000,000, divided into 20,000 shares of the par value of $50 each, and thereupon transferred $1,000,000 from its capital stock account to its surplus capital account. [1] The amount by which the capital stock was thus reduced, $1,000,000, was properly carried in the surplus capital account. It represented a surplus of capital. (*Roberts* v. *Roberts-Wick Co.*, 184 N. Y. 257 [112 Am. St. Rep. 607, 6 Ann. Cas. 213, 3 L. R. A. (N. S.) 1034, 77 N. E. 13].) In New York it has been held that the surplus of capital which is thus left after a reduction of the corporation's capital stock may be distributed in dividends to the stockholders if, after that is done, there shall be left in hand actual capital available for the payment of the corporation's debts exceeding the amount to which the capital stock was reduced. (*Strong* v. *Brooklyn etc. R. R. Co.*, 93 N. Y. 426.) In that case, however, there does not seem to have been any constitutional ground of objection to such distribution of the surplus of capital.

"From an exhibit attached to the petition it may be gathered that, upon prior applications heretofore made to him, respondent has given petitioner permission to distribute to its stockholders $650,000 of the $835,000 collected by it from its shareholders upon assessment. This sum of $650,-000 has been distributed by petitioner among its stockholders pursuant to the permission thus received, leaving of the total assessments levied and collected a balance of $185,000 undistributed. On May 24, 1924, in compliance with the provisions of the Corporate Securities Act (commonly known as the Blue Sky Law) and the rules and regulations of the commissioner of corporations, and on payment or tender of the fees allowed in such cases, petitioner presented to respondent its application for leave to distribute this sum of $185,000 to its shareholders in the form of dividends.

"Respondent has filed a general demurrer to the petition. The reason assigned by him for his refusal to accept or file petitioner's application for permission to distribute the $185,000 or to take any action thereon is that section 309 of the Civil Code in so far as it purports to confer upon the commissioner of corporations jurisdiction to permit or authorize the making of dividends from other than surplus profits, is unconstitutional and void.

"Prior to 1917, section 309 of the Civil Code unconditionally prohibited the making of dividends except from surplus profits arising from the business of the corporation. In that year the section was amended so as to provide, in effect, that the directors of a corporation might make dividends from other than surplus profits upon receiving permission from the commissioner of corporations. The section as thus amended, and in so far as its provisions are germane to the questions here involved, reads: 'Unless they shall have been first permitted or authorized so to do by the commissioner of corporations, directors of corporations must not make dividends except from the surplus profits arising from the business thereof; nor must they create any debts beyond their subscribed capital stock; nor must they divide, withdraw, or pay to the stockholders, or any of them, any part of the capital stock, . . . nor reduce or increase the capital stock, except as provided in section three hundred fifty-nine of this code.' [Stats. 1917, p. 657.]

[2]    "The Corporate Securities Act contains the following provisions: 'The word "security" includes (a) all shares or other interests or rights into which the capital stock, or property of companies or rights of stockholders . . . are divided.' (Sec. 2, subd. 6.) 'A "sale" . . . includes . . . any issue of any security by a company; and the word "sell" includes every act by which such sale is made.' (Sec. 2, subd. 7.). 'No company shall sell . . . any security of its own issue until it shall have first applied for and secured from the commissioner a permit authorizing it so to do. . . . In such application the applicant shall set forth . . . an itemized account of its financial condition, the amount and character of its assets and liabilities, a detailed statement of the plan upon which it proposes to transact business; . . . and such additional information concerning the company, its condition and affairs as the commissioner may require.' (Sec. 3.) 'Upon the filing of such application, it shall be the duty of the commissioner to examine it and the other papers and documents filed therewith, and he may, if he deems it advisable, make or have made a detailed examination, audit, and investigation of the applicant and its affairs. If he finds that the proposed plan of business of the applicant is not unfair, unjust or inequitable, that it intends to fairly and honestly transact its business, and that the securities that it proposes to issue and the methods to be used by it in issuing or disposing of them are not such as, in his opinion, will work a fraud upon the purchaser thereof, the commissioner shall issue to the applicant a permit authorizing it to issue and dispose of securities. . . . '(Sec. 4.) 'The commissioner shall at all times have the power to administer oaths and to make an examination or investigation of the books, records, accounts, and other papers, and of the business of any company . . . permitted or authorized by him . . . to make dividends.' (Sec. 17.) It is a reasonable inference from these provisions of the Corporate Securities Act that the legislature intended that the commissioner of corporations should give his permission to make dividends from other than surplus profits only when he should find that if the dividends were made the corporation would still be left in a sound financial condition—a financial condition that would be safe for the interests of the creditors as well

as of the stockholders. And to enable the commissioner to ascertain whether the corporation's financial condition would be left safe and sound, the statute gives him power to examine witnesses and to investigate the corporation's books and records.

"Respondent claims that so much of section 309 as purports to confer upon him the power to permit the making of dividends from other than surplus profits conflicts with that part of section 11 of article XII of our state Constitution which declares that 'no corporation shall issue stocks or bonds, except for money paid, labor done, or property actually received' and that 'all fictitious increase of stock or indebtedness shall be void.' It also is suggested that this part of section 309 violates other constitutional guarantees. We shall consider respondent's objections in the order of their presentation.

"In support of his claim that so much of section 309 as grants to the commissioner of corporations power to permit the distribution of other than surplus profits is violative of section 11 of article XII, respondent argues substantially as follows: The design of this constitutional provision is to prevent the issuance of 'watered stock'; to accomplish that end it is the purpose of the Constitution to prohibit the issuance of stock unless the money, property or labor given in exchange therefor possesses a value corresponding with the face value of the stock, or at least equals the reasonable worth of the stock; to prevent this beneficent purpose of the Constitution from being circumvented, and to thwart the accomplishment by indirection of that which cannot be done directly, no part of the consideration received by the corporation for its stock, whatever form that consideration may have taken, should ever be distributed to the stockholders prior to the corporation's dissolution, for, as was said in *Hospes* v. *Northwestern Mfg. etc. Co.*, 48 Minn. 174 [31 Am. St. Rep. 637, 15 L. R. A. 470, 50 N. W. 1117], 'If the assets of a corporation are given back to stockholders, the result is the same as if the shares had been issued wholly or partly as a bonus. The latter is merely a short cut to the same result.' To this argument the learned counsel who has appeared as *amicus curiae* makes a reply, the substance and effect of which, as we understand it, is this: The courts of this and other states have held that the inhibition against

the issuance of stock except for money paid, labor done or property actually received is applicable and effective only when the issue is entirely fictitious, i. e., when nothing of value whatever is received or agreed to be received in exchange for the stock; in so holding the courts have practically deprived this constitutional inhibition of all efficacy, or, to employ the language of the *amicus curiae*, it has become for all practical purposes 'innocuous'; it follows as a necessary sequence, says *amicus curiae*, that there is no constitutional reason why a corporation should be required to maintain any ratio between its assets and the face value of the stock which it has issued in exchange for the money, property or labor received by it.

"It will be recalled that petitioner is not asking permission to distribute to its stockholders any part of the one million dollars which it caused to be transferred to its surplus capital account when it reduced its capital stock from two million to one million dollars. From the allegations of the petition it may reasonably be inferred that all of petitioner's capital stock was issued as fully paid stock, and that it was issued for property the value of which equaled, if it did not exceed, the par value of the shares. The stock having thus been paid for in full, the assessments which the corporation thereafter levied and collected from time to time, and which aggregated $835,000, were not made as 'calls.' These assessments, therefore, or rather the sums collected thereon, cannot in any sense be viewed as any part of the consideration which was agreed to be given or paid by the shareholders when they subscribed for their shares of stock. It follows, therefore, that the money which petitioner is now seeking to distribute to its shareholders in the form of dividends—the balance on hand of the total assessments levied and collected—is not and never was any part of the property which the corporation received in exchange for its nominal or share capital of two million dollars. This sum of $185,000 is, of course, a part of the corporation's general capital; and prior to the amendment of section 309 in 1917 it could not have been distributed as dividends, for the reason that, until then, the interdiction of this code section against the making of dividends from aught but 'surplus profits' was absolute and unconditional. But that was but a statutory,

not a constitutional, restraint upon the power of the directors to make dividends.

[3] ''The 'capital stock' of a corporation, in the strict sense of the term, consists of the consideration which section 11 of article XII requires to be received in exchange for all issued stock—whether that consideration take the form of money paid, labor done or property actually received; and it includes all subsequent transmutations of the consideration originally given or agreed to be given for the stock. [4] 'The word ''capital'' applied to corporations is often used interchangeably with the words ''capital stock,'' and both are frequently used to express the same thing—the property and assets of the corporation. Strictly, the capital stock of a corporation is the money contributed by the corporators to the capital, and is usually represented by shares issued to subscribers to the stock on the initiation of the corporate enterprise.' (*Christenson* v. *Eno,* 106 N. Y. 97 [60 Am. Rep. 429, 12 N. E. 648].) It is only the 'capital stock' in this strict sense of the term, and not the other capital or assets of the corporation, which may not be withdrawn or divided without indirectly frustrating the purpose of section 11 of article XII—assuming, without deciding, that the withdrawal or distribution of any of the capital stock would be tantamount to an indirect violation of that provision of our organic law.

''With the possible exception of so much of the corporation's capital as consists of the consideration furnished by the shareholders in exchange for the stock received by them, or is the product of that consideration, the assets of a corporation always could be divided among its shareholders without violating the constitutional inhibition against issuing stock except for money paid, labor done or property actually received. With this possible exception, there never was aught but a statutory inhibition against dividing, withdrawing or paying to stockholders any part of the capital stock. This being the case, there is no reason why the legislature could not amend section 309 so as to permit dividends to be made from so much of the surplus capital as owes its existence to assessments levied and collected upon fully paid stock, even though such surplus capital may not represent 'surplus profits arising from the business' of the corporation.

[5] "We conclude, therefore, that the provision of section 309 which, in effect, permits dividends to be made from other than surplus profits if authorized by the commissioner of corporations, does not violate section 11 of article XII, in so far at least as it is sought to apply the permissive provisions of that code section to the situation presented by the petition now before us.

"It next is contended by respondent that the method provided for securing the permission of the corporation commissioner to a distribution of assets other than surplus profits lacks the essential element of notice to the creditors of the corporation and a hearing at which they may be present. As we understand respondent's contention, it is presented in two aspects. As a first basis for the contention, it is claimed that it is the purpose of section 11 of article XII to provide a fund in the nature of a trust fund for the benefit of creditors and that, therefore, the legislature has no power to authorize a distribution of any part of that fund without notice to the creditors and a hearing accorded to them. As a second ground for the claim that provision for such notice and hearing is an indispensable prerequisite, it is argued that under what is commonly known as the 'trust fund doctrine' all the assets of a corporation constitute a trust fund for the benefit of the creditors; and that, therefore, unless a hearing be accorded to creditors, after due notice, none of the assets of the corporation, other than its surplus profits, may be distributed to the stockholders without violating the creditors' constitutional rights. In other words, it is claimed that, as to the creditors of the corporation, the withdrawal of any assets other than surplus profits amounts to a taking of property without due process of law.

"For reasons already stated, the facts of this case furnish no ground for the claim that the money which this petitioner is seeking to distribute among its stockholders is any part of the assets which section 11 of article XII requires to be received by the corporation. The only assets which, by any stretch of that provision of our organic law, may be said to be within its purview are those which are formed of or are traceable to the consideration given or agreed to be given by the stockholders in exchange for the shares of stock issued to them. But those assets are entirely separate and apart from the fund which petitioner seeks permission to

distribute—a fund which had its genesis in assessments levied and collected upon stock which was wholly paid for at its par value.

"Equally without merit is the claim that the trust-fund doctrine so called entitled the creditors to notice and to a hearing. [6] In the first place, the doctrine commonly known as the 'trust fund doctrine, is, in strictness, limited in its application to those assets which were contributed or should be contributed by the stockholders in payment of their stock subscriptions. That is to say, the doctrine is based upon the idea that, as to creditors without notice of the circumstances under which the stock was subscribed, the corporation is conclusively presumed to have sought credit upon its subscribed capital stock at its par value, either actually paid in or due from stockholders—that unpaid subscriptions are assets to which corporate creditors may look for payment, and that they have the right to insist upon their collection, the same as any other debt due the corporation. But here, as we repeatedly have had occasion to point out, it is not sought to declare a dividend from those assets which represent the consideration contributed or agreed to be contributed by the stockholders in exchange for their shares of stock. The doctrine which respondent probably contends for, if we rightly apprehend his position, is that *all* the assets of a corporation (other than surplus profits earned in the business) from whatever source derived, must be regarded as a fund pledged for the security of creditors; and that therefore the whole capital of a corporation, that which represents assessments levied and collected as well as that which represents the consideration given or agreed to be given in exchange for stock, constitutes a trust fund held in trust for the corporation's creditors. We do not think that such a doctrine is supported either by reason or by the weight of authority.

[7] "It is uniformly held by the federal courts and likewise by some state courts that even those assets to which the so-called trust-fund doctrine is applicable are not charged with any enforceable trust or with any equitable lien on behalf of any general creditor of the corporation, if it be a solvent, going concern; and that such creditors have no vested right of any nature whatever in or to the property of such a corporation. (*McDonald* v. *Williams,*

174 U. S. 397 [43 L. Ed. 1022, 19 Sup. Ct. Rep. 743, see, also, Rose's U. S. Notes]; *Ratcliff* v. *Clendenin*, 232 Fed. 61 [146 C. C. A. 253]; *Carlisle* v. *Ottley*, 143 Ga. 797 [Ann. Cas. 1917A, 573, 85 S. E. 1010].) That this is also the law in this state results inevitably from the reasoning of our supreme court in *Rhode* v. *Dock-Hop Co.*, 184 Cal. 367 [12 A. L. R. 437, 194 Pac. 11], where it is held that fraud, and not the idea of a 'trust,' in any proper sense of that word, is the true basis of the so-called trust-fund doctrine. See also, *Hospes* v. *Northwestern Mfg. etc. Co.*, *supra*, where the court says: 'The phrase that "The capital of a corporation constitutes a trust fund for the benefit of creditors" is misleading. Corporate property is not held in trust, in any proper sense of the term. A trust implies two estates or interests—one equitable and one legal; one person, as trustee, holding the legal title, while another, as the *cestui que trust*, has the beneficial interest. Absolute control and power of disposition are inconsistent with the idea of a trust. The capital of a corporation is its property. It has the whole beneficial interest in it, as well as the legal title. It may use the income and profits of it and sell and dispose of it, the same as a natural person. It is a trustee for its creditors in the same sense and to the same extent as a natural person, but no further.'

"If the doctrine which, for convenience, is commonly referred to as the 'trust-fund doctrine' does not impress with a trust those assets which represent the capital stock contributed or agreed to be contributed by the stockholders of a solvent, going corporation in exchange for their stock, then, *a fortiori*, does no trust in favor of creditors attach to the other assets of such a corporation, such, for example, as moneys collected on assessments levied on the subscribed capital stock.

[8] "It is only when a corporation is dissolved or is insolvent that a 'trust,' *sub modo*, arises in favor of creditors. Then a court of equity, at the instance of the proper parties, will make those funds trust funds which, in other circumstances, are as much the absolute property of the corporation as any man's property is his. In *Wabash etc. Ry. Co.* v. *Ham*, 114 U. S. 587, 594 [29 L. Ed. 235, 5 Sup. Ct. Rep. 1081, see, also, Rose's U. S. Notes], the court says: 'The property of a corporation is doubtless a trust fund

for the payment of its debts, in the sense that when the corporation is lawfully dissolved and all its business wound up, or when it is insolvent, all its creditors are entitled in equity to have their debts paid out of the corporate property before any distribution thereof among the stockholders.' But a solvent corporation, engaged in business as a going concern, holds its property as absolutely as an individual can hold his. Its estate is the same, its interest is the same, its possession is the same. In *Hollins* v. *Brierfield Coal & Iron Co.*, 150 U. S. 371 [37 L. Ed. 1113, 14 Sup. Ct. Rep. 127], the court, speaking of the theory of the capital of a corporation being a trust fund, said: 'In other words, and that is the idea which underlies all these expressions in reference to a "trust" in connection with the property of a corporation, the corporation is an entity, distinct from its stockholders as from its creditors. Solvent, it holds its property as any individual holds his, free from the touch of a creditor who has acquired no lien; free also from the touch of a stockholder who, though equitably interested in, has no legal right to the property. Becoming insolvent, the equitable interest of the stockholders in the property, together with their conditional liability to the creditors, place the property in a condition of trust, first, for the creditors, and then for the stockholders. Whatever of trust there is arises from the peculiar and diverse equitable rights of the stockholders as against the corporation in its property and their conditional liability to its creditors. *It is rather a trust in the administration of the assets after possession by a court of equity than a trust attaching to the property, as such, for the direct benefit of either creditor or stockholder.*' (Italics ours.) (See, also, *Graham* v. *LaCrosse etc. R. Co.*, 102 U. S. 148 [26 L. Ed. 106].)

"In *McDonald* v. *Williams, supra,* it was held that the receiver of a national bank could not recover a dividend paid to a stockholder, not out of the profits but entirely out of the capital, when the stockholder receiving such dividend acted in good faith, believing the same to be paid out of profits, and when the bank, at the time such dividend was declared and paid, was not insolvent, notwithstanding a statutory provision that 'no association or any member thereof shall, during the time it shall continue its banking operations, withdraw or permit to be withdrawn, either in the form of dividends or otherwise, any portion of its capi-

tal.' The court said: 'The complainant bases his right to recover in this suit upon the theory that the capital of the corporation was a trust fund for the payment of creditors entitled to a portion thereof, and having been paid in the way of dividends to the shareholders, that portion can be recovered back in an action of this kind for the purpose of paying the debts of the corporation. . . . When a corporation is solvent, the theory that its capital is a trust fund upon which there is any lien for the payment of its debts has in fact very little foundation. No general creditor has any lien upon the fund under such circumstances, and the right of the corporation to deal with its property is absolute so long as it does not violate its charter or the law applicable to such corporation.' After referring to and quoting from a number of United States Supreme Court decisions, the court continues: 'These cases, while not involving precisely the same question now before us, show there is no well-defined lien of creditors upon the capital of a corporation while the latter is a solvent and going concern, so as to permit creditors to question, at the time, the disposition of the property. The bank being solvent, although it paid its dividends out of capital, did not pay them out of a trust fund. Upon the subsequent insolvency of the bank and the appointment of a receiver, an action could not be brought by the latter to recover the dividends thus paid on the theory that they were paid from a trust fund, and therefore were liable to be recovered back.'

[9] "We conclude, therefore, that since the money which petitioner is seeking permission to distribute is not impressed with any 'trust' in favor of creditors, and since, therefore, the creditors have no vested right therein, they will not be deprived of any property without due process of law merely because the statute has made no provision for notice to them of petitioner's application for a permit to divide the $185,000 among its stockholders, and that, therefore, notice to and a hearing by the creditors are not indispensable prerequisites under the state of facts presented by this petition.

"One more objection remains to be considered, although it has not been urged by respondent—at least it has not been directly urged by him. The objection is suggested by a reading of the brief filed by *amicus curiae*. Anticipating that the point would be raised by respondent, *amicus curiae*

has presented an argument to refute any claim that the legislature improperly delegated legislative or judicial powers to the commissioner of corporations when it empowered that officer to permit dividends to be made from assets other than surplus profits. If the matter before us were an appeal from the judgment or order of an inferior court we might not feel constrained to consider a point not urged by the party upon whom rests the burden to point out error in the judgment or order. **[10]** Ordinarily, an appellant who has neglected to present a point in his brief may be precluded from insisting that the court consider the matter when deciding the case—though even on an appeal this is not a hard-and-fast rule. (*Shubert* v. *Lowe,* 193 Cal. 291 [223 Pac. 550].) But where, as here, we are asked to issue our writ as a court of original jurisdiction, we do not think that the rule should apply. We do not think we should issue our writ in any case if we believe there is good reason why it should not issue, regardless of whether that reason is or is not called to our attention by the defendant in the proceeding. We shall therefore consider the point suggested by the brief of *amicus curiae.*

**[11]** "The power which section 309 confers upon the commissioner of corporations is not a judicial power of a character which may not be delegated. In determining whether the directors of a corporation shall be permitted to make dividends from other than surplus profits the commissioner no doubt exercises some discretion, which in a strict sense is in its nature judicial; but the exercise of purely administrative functions quite often calls for that kind of discretion. What section 309 requires the commissioner to do is, not to adjudicate—unless every exercise of judgment is to be called a judicial act—but to perform a duty of ascertainment—to determine, by an examination of witnesses and the books and records of the corporation and from a consideration of values, whether, if the dividends be made, the corporation will remain in a safe financial condition. This is a ministerial or administrative function. It is well settled that such acts, though involving in some degree an exercise of judgment and discretion, are not so far judicial that the legislature may not place the power elsewhere than in the courts. See *County of Los Angeles* v. *Spencer,* 126

Cal. 670 [77 Am. St. Rep. 217, 59 Pac. 202]; where it was held that the power which the Horticulture Act of 1881, gives to the horticultural commissioners to determine whether any particular place is a nuisance and to abate it, is not a judicial power within the meaning of the inhibition of article III of the state Constitution.

[12] "A more difficult problem is involved in the question whether there is an improper delegation of legislative power. It is well settled that the legislature may commit to an administrative officer the power to determine whether the facts of a particular case bring it within a rule or standard previously established by the legislature for his governance. A familiar illustration is where the legislature enacts a law prescribing that the rates to be charged by a public utility shall be 'reasonable,' and creates a commission with power to investigate and fix the rates. If, however, no standard by which the officer is to be governed be prescribed by the lawmakers, then there is an attempt to entrust a mere administrative officer with the plenary power of the legislature, and there will then be no guard against possible arbitrary action. Thus in *State* v. *Great Northern Ry. Co.*, 100 Minn. 445 [10 L. R. A. (N. S.) 250, 111 N. W. 289], the court having before it an act of the Minnesota legislature which empowered a railroad corporation to increase its capital stock if it secured the approval of the railroad and warehouse commission, held that so much of the act as required the approval of the commission was unconstitutional and void for the reason that the manner in which, and the terms upon which the commission might authorize the increase of stock to be made were entirely committed to the unrestrained judgment of the commission, without any standard having been prescribed by the legislature to govern the commission in the exercise of its judgment. (See, also, *People* v. *C. Klink Packing Co.*, 214 N. Y. 121, Ann. Cas. 1916D, 1051 [108 N. E. 278].)

[13] "If section 309 were the only enactment to which we could look to ascertain the exact nature of the power conferred upon the commissioner of corporations in such cases as this, we probably should feel constrained to hold that there had been an attempt to delegate legislative power to the commissioner in violation of the principle that the law-making function is assigned exclusively to the legislature.

But section 309 can and should be read in connection with and in the light of the Corporate Securities Act. When so read, we think it clear that the legislature has prescribed a sufficient standard for the guidance of the commissioner. The leading idea which seems to run through the Corporate Securities Act is that in all cases the commissioner is to consider whether the action which he is asked to sanction— the making of dividends from other than surplus profits, for example—will leave the corporation in a safe financial condition. This, therefore, is the standard prescribed by the legislature for the guidance of the commissioner, and the one by which he is to be governed in the exercise of his discretion whether to permit dividends to be made from other than surplus profits. We believe it to be a sufficient standard and an adequate guard against arbitrary action. In *Iowa L. Ins. Co.* v. *Eastern Mut. L. Ins. Co.,* 64 N. J. L. 340 [45 Atl. 762], it was held that a statute providing that is shall not be lawful for any life insurance company to contract for reinsurance of its own risks or to reinsure the risks of another company, unless two-thirds in number of the holders of the policies proposed to be reinsured shall assent thereto in writing, and that the contract for such reinsurance shall be utterly invalid and of no force until it shall have been approved by the secretary of state, which he shall do only after due inquiry and upon satisfactory evidence that the interests of the policy holders are fully protected, and that the proper consent has been given, is not unconstitutional as attempting to delegate to the secretary of state a legislative power, since it merely requires him to enforce a prescribed rule upon ascertaining, by an examination of values and mathematical relations, whether a safe financial situation exists, and whether a certain document has been properly signed.

"What section 309 and the Corporate Securities Act call upon the commissioner to do is, not to legislate by laying down a new rule, but to enforce a prescribed rule—the rule of safe financial condition. Legislative power was exercised when the legislature, through the Corporate Securities Act and section 309, declared, in substance and effect, that dividends might be made from assets other than surplus profits if the proposed division of the assets would be fair, just and equitable and would leave the corporation in a sound

financial condition. The commissioner is made the mere
agent of the law-making department to ascertain and declare
the facts upon which its expressed will is to take effect.

"The line of demarkation between legislative and admin-
istrative functions is not always easily discernible, the one
often running into the other. But, as was said by Mr. Jus-
tice Brewer in *Chicago & Northwestern R. Co.* v. *Dey*, 35
Fed. 866 [1 L. R. A. 744], 'The law books are full of
statutes, unquestionably valid, in which the legislature has
been content to simply establish rules and principles, leaving
execution and details to other officers.' Thus in *Trustees of
Saratoga Springs* v. *Saratoga Gas etc. Co.*, 191 N. Y. 123
[14 Ann. Cas. 607, 18 L. R. A. (N. S.) 713, 83 N. E. 693],
it was held that where a statute provides that a commission
shall fix the maximum price of gas and electricity 'within
the limits prescribed by law,' the intention is to include both
the common law and statutory law; and as the common law
prescribes that the rates shall be 'reasonable,' it was held
that the statute prescribed reasonableness as the standard for
the guidance of the commission, and that such standard is
not too general. (See, also, *State* v. *Railroad Com.*, 137 Wis.
80 [117 N. W. 846]; *Ex parte McManus*, 151 Cal. 331 [90
Pac. 702]; *Ex parte Whitley*, 144 Cal. 167 [1 Ann. Cas.
13, 77 Pac. 879]; *Union Bridge Co.* v. *United States*, 204
U. S. 364 [51 L. Ed. 523, 27 Sup. Ct. Rep. 367, see, also,
Rose's U. S. Notes]; *Sears R. Co.* v. *Federal Trade Com.*,
258 Fed. 307 [6 A. L. R. 358, 169 C. C. A. 323]; *Railroad
Com.* v. *Central etc. Ry. Co.*, 170 Fed. 225 [95 C. C. A.
117]; *Klafter* v. *State Board*, 259 Ill. 15 [Ann. Cas. 1914B,
1221, 46 L. R. A. (N. S.) 532, 102 N. E. 193]; *Insurance
Co.* v. *Welch*, 49 Okl. 620 [Ann. Cas. 1918E, 471, 154 Pac.
48]; *Idaho Power etc. Co.* v. *Blomquist*, 26 Idaho, 222
[Ann. Cas. 1916E, 282, 141 Pac. 1083].)

"We find no difficulty in holding that section 309 may be
read in the light of the provisions of the Corporate Securi-
ties Act, and that when so read there will be found in it
a sufficient criterion of standard prescribed by the legisla-
ture for the guidance of the commissioner. Indeed, the
courts have often gone so far as to hold that an act may be
construed so as to read therein an implied declaration of
an adequate standard whereby the administrative body or
officer is to be governed. Thus in *Ex parte McManus, supra,*

Mr. Justice Shaw, in his concurring opinion, says: 'The statute does not expressly prescribe any standard of qualification in the applicant. It must be construed as at least an implied declaration that no person shall be entitled to a certificate as a licensed architect unless he has such ordinary knowledge of the principles and science of that art or profession, and such ordinary skill in the practical application of those principles and that science, as are usually possessed by those engaged therein. It is the usual standard implied in law, where no different standard is expressed by the statute.' (151 Cal. 338 [90 Pac. 705].) See *Laurelle* v. *Bush,* 17 Cal. App. 409, 415, 416 [119 Pac. 953]; also *Trustees of Saratoga Springs* v. *Saratoga Gas etc Co., supra,* where it was held that the statute, by implication, incorporated into itself the common-law rule that rates shall be 'reasonable.'

"This proceeding undoubtedly involves questions of much importance to corporate and general interests, and we have endeavored to give to them that careful consideration which is commensurate with their gravity, with the result that we have arrived at the conclusion that section 309, in so far at least as it is sought to apply it to the facts of this case, does not contravene any constitutional requirement or guarantee."

Let the writ issue as prayed for.

Waste, J., Lawlor, J., Seawell, J., Lennon, J., and Shenk, J., concurred.

Myers, C. J., deeming himself disqualified, did not participate in the foregoing opinion.