## PARKINSON v. STATE BANK OF MILLARD COUNTY ET AL.

No. 5481. Decided August 3, 1934. (35 P. [2d] 814.)

*J. A. Melville* and *A. C. Melville,* both of Salt Lake City, for plaintiff.

*Cline, Wilson & Cline,* of Milford, for defendants.

STRAUP, Chief Justice.

The State Bank of Millard County, a commercial banking corporation organized under the laws of Utah, for more than twenty-five years at Fillmore, Millard county, was engaged in and doing a general banking business. Its shares of stock consisted of 600 shares at a par value of $100 each, all fully paid and contributed to the corporation. The bank on February 1, 1932, becoming insolvent, all of its business, assets, and affairs were taken over for liquidation by Hadlock, the then state bank commissioner who later was succeeded in the office by Malia.

Nellie Parkinson, the plaintiff, by her petition filed in this court alleging that she had a preferred claim against the bank and the commissioner and in virtue of Rev. St. Utah 1933, § 7-3-35, in force when she had dealings with the bank had a lien on the capital of the bank as security for the payment of her claim and that, without paying it, the bank commissioner out of capital and assets of the bank was paying unsecured and unpreferred claims of common creditors and making settlements with some of the depositors by assigning and transferring to them a part of the capital and assets of the bank in satisfaction of their claims, an alternative

writ of prohibition was granted restraining the bank commissioner from paying and the district court from ordering payment of such clams or making such settlements, until the claim of the plaintiff was first paid in full.

By the petition it, among other things, is alleged that for a period of more than three years prior to February 1, 1932, when the bank commissioner took over the affairs of the bank, the bank had a paid-up "capital and surplus of more than $100,000," and that a permit, as provided by Rev. St. Utah 1933, § 7-3-34, had been issued to it by the commissioner to act as executor and administrator and to exercise other trust powers pursuant to the provisions of the sections of the statute referred to; that Ann Crane Paxton, a resident of Millard county, died testate August 21, 1930, and by her will nominated the bank executor of her estate. August 28, 1930, the bank presented the will for probate, and on its application, and in pursuance of the sections of the statute referred to, was by the district court of Millard county appointed such executor without bond and qualified to act as such. In the course of its administration of the estate the bank collected and there came into its hands something over $12,740, moneys and property of the estate which was kept on deposit by it in its bank. May 14, 1931, the bank as executor made and filed a report and final account and settlement and prayed a distribution of the property of the estate consisting of moneys amounting to $12,740, after payment of all expenses and disbursements of administration. On June 19, 1931, the account as presented was approved and settled by the district court and the moneys on hand ordered distributed and paid to the various legatees of the will, among whom was the plaintiff, Nellie Parkinson, residing in Melbourne, Victoria, Australia, who under the will was entitled to $6,360 which amount was ordered distributed and paid to her by the executor. Thereafter and some time prior to December, 1931, the bank paid her $570.40, and in December, 1931, it (as represented and stated by the parties in oral argument of the cause) mailed

to her in Australia a check payable to her and signed by an officer of the trust department of the bank and drawn on the bank itself for the balance of $5,789.60, which check was indorsed by her and returned to the bank for payment, but before it was received by the bank and presented for payment, the business and affairs of the bank on the ground of insolvency had been taken over by the bank commissioner for liquidation. Whether the bank when the check was drawn had sufficient funds in its trust department to meet the payment of the check or what amount of moneys the bank had on hand when it was taken over by the commissioner is not made to appear. A demand on behalf of the plaintiff was made on the bank and on the bank commissioner for payment of the balance due and unpaid amounting to $5,789,60, but to pay the same or any part thereof the bank failed and the bank commissioner declined and refused to do. It further is alleged in the petition that such sum of $5,789.60 at no time became assets of the bank— that such money was the property of the plaintiff—and was no part of the assets of the bank for liquidation, and wrongfully was withheld by the commissioner from the plaintiff. That allegation is denied by the commissioner.

So on September 30, 1932, the plaintiff brought an action in the district court in and for Millard county against the bank and the commissioner wherein the matters and things hereinbefore recited were alleged, in which action the bank defaulted but in which the commissioner answered. Upon proceedings had in such cause, findings, conclusions, and decree were made and rendered December, 1932, whereby it was adjudged and decreed that there was due and owing the plaintiff and unpaid the sum of $5,789.60 with interest and that she have and recover such sum from the bank and from the commissioner in charge of the liquidation of the bank and that he pay the same to her out of "the capital of the bank," and that the capital and assets of the bank, in virtue of the sections of the statute referred to, be held as security for the payment of such sum and a first and prior lien was

impressed on "the capital of the bank" for the payment of the same. In that action it also was found and adjudged, and it so is alleged in the petition for the writ, that the bank at no time was released or discharged as executor of the estate. A motion for a new trial in such action was made by the commissioner, which on May 8, 1933, was overruled. From the decree and judgment rendered in such action the commissioner on November 2, 1933, prosecuted an appeal to this court and caused the transcript of the record to be transmitted to this court on November 23, 1933, which appeal is now pending, unpresented, and undetermined awaiting the determination of the mater presented by the petition in this cause for a permanent writ of prohibition. However, about all of the material facts presented in the action referred to are alleged and presented by the petition in application for the writ and admitted by the demurrer and answer of the bank and of the commissioner, except as herein otherwise stated.

It further is alleged in the petition that the capital stock of the bank at the time its doors were closed and the affairs of the bank taken over by the commissioner and for a long time prior thereto consisted of 600 shares of stock of the par value of $100, and a surplus as shown by the books of the bank in excess of $40,000; that its assets were in excess of $300,000 and its liabilities, including deposits, were more than $50,000 in excess of its assets, and that more than the sum of $5,789.60 was collected by the commissioner from stockholders of record of the bank upon their statutory stockholders' liability.

It also is alleged by the petition that the commissioner refused to recognize the claim of the plaintiff as a preferred claim or as a lien on any property or assets of the bank taken over by him or coming into his hands, that he asserted her claim to be merely an unsecured claim of a common creditor and as such to share ratably with claims of depositors and other unsecured claims against the bank, and that he, unless restrained, would so dispose of the proceeds of the

assets of the bank; and that in addition thereto, the commissioner had and, unless restrained, would continue, in some instances, to assign and transfer particular assets of the bank in settlement and in satisfaction of claims of depositors, to the prejudice of other claimants, especially the plaintiff who asserted a preferred claim and a lien on the "capital of the bank" secured to her in virtue of the sections of the statute referred to.

The bank and the commissioner by their demurrer and answer admitted substantially all of the material allegations of the petition, admitted the amount claimed by plaintiff was past due and unpaid, that the claim arose in manner as alleged in the petition while the bank was acting as executor of the estate, that in virtue of the sections of the statute referred to the plaintiff had a lien on "the capital of the bank" to secure the payment of the claim, that assets of the bank in excess of $300,000 were received by the commissioner, and that the liabilities were more than $50,000 in excess of assets, but denied that when the affairs of the bank were taken over by the commissioner there was "any capital" or surplus of the bank in existence or that any came into the hands of the commissioner or that there was any capital to satisfy the claim of plaintiff, and averred that the "capital" originally possessed by the bank including its capital stock investment, surplus, and undivided profits, long prior to the commissioner taking over the affairs of the bank were lost and ceased to exist, or commingled with other funds had gone into general assets of the bank untraceable in any specific property, that "assets" did not constitute "capital" within the meaning of the sections of the statute referred to; and that, likewise, the moneys which the bank as executor of the estate had collected and by the court ordered distributed and paid to the plaintiff as a legatee under the will were commingled with its general fund, or otherwise by the bank applied and paid out in the course of its corporate business, or had become a part of the general assets of the bank, and as such untraceable.

The commissioner also admitted that settlements were made with some depositors by transferring to them certain assets of the bank, but alleged that none of the "capital" of the bank was used for such purpose and further averred that such settlements were made without prejudice or injury to other claimants. He further admitted that he had collected from stockholders of the bank on their statutory liability sums of money in excess of the amount due the plaintiff, but averred such moneys were not "capital," that they were funds held by the commissioner for the benefit of all of the claimants and were not included within the plaintiff's lien. It further was made to appear that the commissioner had on hand sums of money derived from liquidation of assets in excess of the amount due the plaintiff as claimed by her, but he denied that the assets from which such sums were obtained constituted "capital" within the meaning of the sections of the statute referred to.

The statute, Rev. St. Utah 1933, § 7-3-34, and section 7-3-35, the same as Laws of Utah 1923, c. 12, § 981x, Laws of Utah 1921, c. 24, §§ 981x1 and 981x2, under the title and chapter of "Banks and Banking," provided that:

"Any bank having a paid-in capital and surplus of not less than $25,000, and in cities of the first class not less than $100,000, upon the issuance to it of a permit by the bank commissioner, shall have authority and power to act as assignee, agent, receiver, guardian of the estate of minors and incompetent persons, executor, administrator, registrar of stocks and bonds, and to execute trusts of every description not inconsistent with law."

Section 7-3-35, particularly here drawn in question provides that:

"Whenever any such bank shall accept an appointment as assignee, agent, receiver, guardian, executor or administrator, or be directed to execute any trust, the capital of such bank shall be held as security for the faithful performance of such duties and be held liable for any default whatever, and no bond shall be required of it for the faithful performance of such trust, unless the court in its discretion shall require a bond, and the oath or affirmation of any officer of

such bank for and on its behalf shall be deemed to be the oath or affirmation of such bank."

Because of such provisions of the statute it is admitted by the commissioner that the plaintiff "has a lien on the capital" of the bank as and for security of the payment of her claim, but he contends that the phrase of the statute "capital of such bank shall be held as security," etc., means the moneys paid in or property contributed by the incorporators or share owners in payment of shares of stock issued to them, here, $60,000 as originally paid in for such shares of stock; but since under the banking act the bank was not required, as admittedly it was not, to keep such moneys separate and apart from its general or other funds or to invest such moneys in any specific property, such as bonds or other securities, as and for security of its "capital" and was authorized and permitted, as admittedly it was, to use and expend such moneys for any and all corporate purposes, that, as averred by him, the whole of such moneys, $60,000, long before the affairs of the bank were taken over by him, were by the bank in the course of its business and operations paid out and expended and became part and parcel of its losses or invested and untraceable in other property or properties of the bank, and thus the $60,000 as the capital of the bank were exhausted and ceased to exist; and hence while "assets" in excess of $300,000, the character or description of which is not disclosed, were received by and came into the hands of the commissioner, yet "assets," under the statute, may not be regarded as "capital," and therefore no "capital" was received by him to which the plaintiff's lien had attached or with which he was authorized or justified to pay plaintiff's claim otherwise than as an unsecured claim ratably with other claims of common and unsecured creditors.

In support of such contention the commissioner relies on the case of *Child et al.* v. *Ogden State Bank*, 81 Utah 464, 20 P. (2d) 599, 602, 88 A. L. R. 1284. The alleged trust

in the Child Case was one created by contract—by a "trust agreement"—between Child and the bank, by the terms of which Child deposited and entrusted moneys with the bank to be invested by it for the benefit of Child in approved securities, preferably in first mortgages. It was claimed by Child, and others similarly situated, that the bank in breach of its trust and in violation of its agreement used and commingled such funds with other funds for general corporate purposes, and when the bank was taken over by the commissioner for liquidation, Child and others similarly situated claimed a lien on the assets of the bank to be first paid before payments to common and unsecured creditors. The right of such preferred and lien claimants was denied by the commissioner. Hence, an action independently of the liquidation proceedings was brought in the district court to ascertain and determine such claimed rights. But the commissioner, in the liquidation proceedings on his application and over the objections of Child and others similarly situated before any such determination, was granted permission, by the court in the liquidation proceedings, to pay a dividend of a substantial amount to common and unsecured creditors, without payment to the preferred claimants as such. Thereafter the commissioner made another application to pay a further dividend to common creditors whereupon Child and other claimants similarly situated again objected thereto, until the rights of such claimants were first determined and adjudged; and if adjudged in their favor, that their claims be first paid before claims of common and unsecured creditors were paid. Notwithstanding the commissioner in effect joined in the request for such a hearing and determination, the district court declined to entertain such objections or protest, ruled that no objections to the commissioner declaring a dividend would be entertained, that the question of whether or not dividends could be paid was for the determination of the commissioner and not for the court, and that such matters could be arrested only by injunctive proceed-

ings; hence the court overruled the objections and ordered the dividends paid to common creditors.

At that stage of the proceedings an alternative writ of prohibition on behalf of Child and others was granted by this court, restraining the payment of dividends to common creditors, until the rights of the alleged preferred claimants were heard and determined. Upon a hearing by this court the writ was made permanent.

By the prevailing opinion, after a statement of the facts and of the issues, this court stated that there was "only one matter upon which this court is called upon to pass," which was, "should the proposed dividend be paid and leave, as among claimants, their rights, liens, or priorities, if any, to be determined afterward, or must the rights, liens, and priorities among claimants be determined before the assets of the bank, in the hands of the liquidators, are further depleted by payment of dividends?" And at the conclusion of the opinion and as to what was decided thereby, this court further stated: "All we do decide is that the plaintiffs have an apparent claim or interest in the assets of the bank sufficient to entitle them to have the hand of the court and of the liquidators of the bank stayed until the court has determined in the liquidation action the rights, the amounts, the priorities, the liens, if any, of all claimants, and, having done so, proceed in accordance with the said determination to distribute the amounts to the persons entitled thereto, and upon such notice as the court shall direct in the orderly liquidation of the assets of the Ogden State Bank," and thereupon the court made the alternative writ permanent.

However, in the course of the prevailing opinion some observations were made with respect to the language, "the capital of such bank," as contained in Laws Utah 1921, section 981x1, now section 7-3-35, supra, and by the court stated that substantially identical language was contained in statutes relating to loan and trust associations, which language "has reference to an appointment under a court order," and that "the capital of the said corporation shall be

held as security for the faithful performance of such duties and be held liable for any default whatever," referred "to the invested capital." It then was further observed that the word "capital" as used in section 981x1, now 7-3-35, supra, "must mean the same thing" and meant "subscribed, paid-up capital," notwithstanding that trust and loan companies were required to keep their capital separate and distinct from other moneys or assets of the association or to be invested in government or municipal bonds, while "capital" of the bank was not required to be so kept separately or to be so invested but was permitted to be used by the bank for any and all corporate purposes. Still, in the very next sentence in the prevailing opinion it further is stated that:

"In the instant case we have no trustee or fiduciary appointed by an order of the court," etc.

While I concurred in the result reached by the prevailing opinion restraining payment of claims to common creditors until the rights of the alleged preferred and lien claimants were heard and determined, still I did not concur in what was said in the prevailing opinion with respect to the meaning of the term "capital," as used in the section of the statute in question. Since, and as stated in the prevailing opinion, the "only one matter upon which this court is called upon to pass" was whether the proposed dividend should be paid to common creditors before rights, liens, or priorities, if any, of the alleged preferred claimants were determined, and in effect as held, all that was decided by this court was that the hand of the lower court and of the liquidators of the bank be stayed, until that court "has determined in the liquidation action the rights, the amounts, the priorities, the liens if any, of all claimants," etc., I, and for reasons stated in my concurring opinion, regarding the observations respecting the term "capital" a matter which this court "was not called upon to pass," that the views so expressed were unnecessary, the case not ruled or decided upon them, the permanent writ granted notwithstanding

such expressed views, and thus what was said in such particular was mere dicta; and until a case where such views are necessary to a decision and to a construction of the statute, neither bench nor bar under stare decisis is required to follow or adopt them and each privileged to invoke, as I do, stare recusare.

In the next place, by the prevailing opinion in the Child Case it was observed that the language in question, section 7-3-35, the same as employed in the statute relating to trust and loan companies, "has reference to an appointment under a court order," and that "in the instant case we have no trustee or fiduciary appointed by an order of the court." We here have a fiduciary, an executor of an estate, appointed by order of the court and who was under its direct control and a case where the bank is clearly within the express terms of the act. The matter involved in the Child Case was with respect to a mere private contract or agreement between Child and the bank wholly separate and apart from any court order or other judicial action. There thus is a further distinguishing feature between the case in hand and the Child Case. The language of the section in question is "whenever any such bank shall accept an appointment as assignee, agent, receiver, guardian, executor or administrator, or be directed to execute any trust, the capital of such bank shall be held as security," etc. If now and as indicated in the Child Case such language "has reference to an appointment under a court order," then the bank in that case did not come within the provisions of the section in question, for it was not appointed by any court order, nor "directed" or controlled by any such or any order or by any judicial action. And it is quite aparent that the words "appointment" and "directed," as used in the section, refer to some order of court or other judicial action, and not to a mere private contract or agreement between the parties as in the Child Case, and with which in the making or performance of it, no court or any judicial or other tribunal had anything to do, or was in any wise concerned, or empowered

to direct or exercise any control whatever over it. It was a mere private matter between the parties. Thus, the bank in the Child Case not coming within the provisions of the section in question, what the court in that case said with respect to the meaning or construction of the phrase, "the capital of such bank," was concerning a matter not before the court and was mere dicta.

I therefore am of the opinion that the question as to the meaning or construction to be given the language, "the capital of such bank shall be held as security," etc., and as contained in section 7-3-35, supra, is still at large, especially when considered in view of the admitted facts in hand. So considering it, I am of the opinion that to give the word or term "capital" a construction as contended for by the commissioner, that it means only money or property paid in or contributed by the stockholders to the corporation in payment of shares of stock issued to them, and not assets *though acquired by the use of such moneys so paid in or in which they were invested*, is, when applied to a bank or other corporation not required to separately keep such moneys, permitted to use them for all corporate purposes and authorized to act as an executor or administrator of an estate without bond, to destroy the efficacy of the admitted lien created by the statute and to render it fruitless.

It is conceded that the term "capital," as applied to corporations, frequently is used in a different sense. Sometimes, and as stated in a leading and much cited case, *Smith* v. *Dana,* 77 Conn. 543, 60 A. 117, 69 L. R. A. 76, 107 Am. St. Rep. 51, where many cases are cited, it is used in a "strict sense" to designate the fund, property, or other means contributed or agreed to be contributed by the share owners as the financial basis for the prosecution of the business of the corporation; sometimes when what is meant to be designated is that portion of the assets of the corporation, regardless of their source, which is utilized for the conduct of the corporate business and for the purpose of

deriving therefrom gains and profits; and frequently the term is employed in a still wider sense, as descriptive of all the assets, gross or net, of a corporation, whatever their source, investment, or employment. The same thought is expressed by the Massachusetts court in *Hood Rubber Co.* v. *Commonwealth,* 238 Mass. 369, 131 N. E. 201.

The ordinary and popular meaning of the term is the wealth employed in carrying on a particular trade, manufacture, business, or undertaking; stock in trade; the actual estate, whether in money or property, which is owned or employed by an individual, firm, or corporation in business and as commonly used to indicate financial resources. Century Dictionary and Cyclopedia; Standard Dictionary. In Bouvier's Law Dictionary, Rawle's 3d Ed., it is stated that "capital signifies the actual estate, whether in money or property, owned by an individual or a corporation." So, too, Black's Law Dictionary, and 5 Am. & Eng. Ency. Law (2d Ed.) 134, Michie on Banks and Banking, vol. 2, p. 6, says that "capital" and "capital stock" of a bank, while sometimes used interchangeably, are not one and the same thing; that "capital" includes the entire assets of the bank whether represented by money paid in for stock, surplus, undivided profits, or other property of the bank, while "capital stock" represents only the total amount derived from the issuance of the shares of stock. In 2 Fletcher's Cyc. Corporations (Permanent Ed.) p. 17, the author says that:

"The term 'capital' as applied to corporations is used with widely varying significations. Somtimes it is used synonymously with the term 'capital stock' as meaning the amount subscribed and paid in by the shareholders, or secured to be paid in, and upon which the corporation is to conduct its operations. Properly speaking, however, 'capital' means the actual property or estate of the corporation, whether in money or property, and not the capital stock."

In support thereof numerous cases are cited by such authors, especially the latter. Substantially the same principle is announced in 5 Thompson on Corporations (3d Ed.)

245. So, too, in 7 R. C. L. 195, it is said that "capital stock" of a corporation is the fund, property, or other means contributed, or agreed to be contributed, by the shareholders as the financial basis for the prosecution of the business of the corporation; but that the term "capital" is used to designate that portion of the assets of a corporation, regardless of their source, which is utilized for the conduct of the corporate business and for the purpose of deriving therefrom gains and profits. In *Chicago, M. & St. P. R. Co.* v. *Harmon*, 89 Mont. 1, 295 P. 762, it is stated that, "capital stock" is, strictly speaking, the money contributed by incorporators for which they receive certificates of stock, and that "capital" includes this contribution with all gains or profits realized by its use or acquired from other sources. The Missouri court, in *State ex rel. Corinne Realty Co.* v. *Becker*, 320 Mo. 908, 8 S. W. (2d) 970, stated that the term "capital" properly means, not the capital stock, but the actual property or assets of the corporation, whether in money or property. To that effect, among other cases which could be cited are *Turner* v. *Cattleman's Tr. Co.*, *etc.* (Tex. Com. App.) 215 S. W. 831; *In re Prudential Tr. Co.*, 244 Mass. 64, 138 N. E. 702; *Trefry, Tax Commissioner*, v. *Putnam*, 227 Mass. 522, 116 N. E. 904, L. R. A. 1917F, 806; *Person & Riegel Co.* v. *Lipps*, 219 Pa. 99, 67 A. 1081; *West* v. *City of Newport News*, 104 Va. 21, 55 S. E. 206; *Christensen* v. *Eno*, 106 N. Y. 97, 12 N. E. 648, 60 Am. Rep. 429; *Wells* v. *Green Bay & M. Canal Co.*, 90 Wis. 442, 64 N. W. 69; *Dominguez Land Corp.* v. *Daugherty*, 196 Cal. 468, 238 P. 703; *State ex rel. Intermountain Lloyds* v. *Porter*, 88 Mont. 347, 294 P. 363; *Malley* v. *Old Colony Tr. Co.* (C. C. A.) 299 F. 523; *In re Estate of Wells*, 156 Wis. 294, 144 N. W. 174; *Williams* v. *Brownstein* (D. C.) 1 F. (2d) 470. To that effect in principle is also the case of *Cooper* v. *Light & R. Co.*, 35 Utah 570, 102 P. 202, 136 Am. St. Rep. 1075, and is so regarded and cited by text writers. There the term "capital stock" was so regarded. The word "capital" is a still broader and more comprehensive term. By some of the authorities it is said

that "capital" of a corporation consists of the property and assets of the corporation to which creditors may look and resort to in payment of their claims.

In view of the text and judicial authorities referred to, it, by the great weight of authority, is clear that the term "capital" as applied to corporations generally including banking corporations, whether the term be regarded in a popular sense and in the common usage of the language or in a legal sense, embraces the actual estate including assets of the corporation, whether money or property owned by it, and whether represented by money paid in for shares of stock or other property acquired and owned by the corporation. A majority of the court are of the opinion that the term in such sense was employed by the statute in question. Ordinarily the Legislature speaks only in general terms. Its intention and meaning primarily must be determined from language of the statute which should be given a liberal interpretation. Words and phrases are presumed to have been used according to their plain, natural, and common import and usage of the language, unless obviously used in a technical sense. Such is the effect of our statute, Rev. St. Utah 1933, § 88-2-11.

While the views thus expressed concerning the meaning of the term "capital," as applied to corporations, generally are, in the main, not disputed, yet further views are entertained by a minority of the court that the term "capital" as contained in section 7-3-35, when considered in connection with the preceding section and with the language, that "any bank having a paid-in capital and surplus" of a stated amount may obtain a permit to act as an executor or administrator, etc., and when considered in connection with other sections of the banking act, was intended to be employed in a restricted and limited sense not so broadly as the term ordinarily is regarded and applied to corporations generally; and that when so considered, the term as used in the statute embraces only what was by the incorporators or owners of shares paid in or contributed

for shares of stock issued to them and with which the bank in the first instance was given means to carry on its business, still such view does not, as is held by the minority, lead to the conclusion contended for by the commissioner, that when such moneys have been paid out or expended for corporate purposes in carrying on the business and operations of the bank and may have become part and parcel of its losses or invested in other property or assets of the bank the "capital" as such became lost and ceased to exist, for the reason that, in such case, equity for the protection of the lien claimant whose lien is created by the statute, to the extent of the amount of such "paid in capital," here $60,000, will follow such capital into the assets of the bank and impress the lien on them, not exceeding the amount of such "paid in capital," though such capital nor the moneys collected by the bank as executor and not accounted for, may not be traceable or identified in any specific property or assets taken over by the commissioner.

Whatever view may be taken as to the proper interpretation of the section of the statute in question, where a bank without bond is appointed executor or administrator of an estate, it is clear that it was the undoubted intention of the Legislature to secure the estate and those interested therein in the faithful performance and discharge of such administrative duties and to give a lien which would afford them ample protection. We are all agreed as to that. And if according to the contention of the commissioner what moneys or property paid in or contributed to the bank in payment of shares of stock issued to them had prior to the bank's appointment been paid out or disposed of in the conduct of its banking operations and corporate business, as it admittedly was permitted and authorized to do, or if the bank when appointed had intact such moneys or property or moneys in lieu thereof, but thereafter and before rendering an account of its stewardship had, in the course of its banking business and for corporate purposes, paid out and disposed of such moneys and property and unless traceable and

identified in specific property or assets in which they were invested or became a part (which lien claimants ordinarily are unable to do nor in most instances aided by a resort to the books or records of the bank), there was no "capital" to which the lien attached, the lien created by the statute is but an idle ceremony lulling those interested in estates into the belief of a security and protection which they did not have.

Thus, whether the term "capital" as employed in the statute be regarded as the actual estate and assets of the bank including moneys paid in for shares of stock and other property acquired and owned by it, or whether the term be regarded only as moneys paid in or property contributed for such shares, either or both views, as applied to the case in hand, lead to the same result requiring the alternative writ heretofore issued to be made permanent. All members of the court concur in such result, a majority upon the view and theory as herein first expressed as to the meaning of the term "capital," a minority upon the other expressed view and theory as to the meaning of such term. However, since both sections of the statute, 7-3-34 and 7-3-35, herein involved and considered, though adopted by the Legislature when it by its General Session of 1933 adopted the Revised Statutes of 1933 (chapter 77), yet later in that session (Laws of Utah 1933, ch. 10, § 14, p. 15) repealed both such sections "and all other acts or parts of acts in conflict herewith," abrogating the issuance of permits to banks to act in any fiduciary or trust capacity as provided by section 7-3-34, and the appointment of banks to act in any such capacity as by section 7-3-35 provided, why longer mourn at the bier of the departed without even hope or expectation of resurrection.

In view of the unanimous conclusion, whether arrived at on the one theory or the other, that the writ should be made permanent, and because of the response of the commissioner to the alternative writ that he deposited or had on deposit in bank sufficient moneys derived from proceeds of assets

with which to pay plaintiff's claim in full if by this court it be held she had a lien on assets coming into his hands, it is unnecessary to consider whether her lien also attached to or covered moneys collected by the commissioner from stockholders on their statutory stock liability, nor to consider the further question with respect to the alleged and admitted assignments or transfers by the commissioner of particular assets in payment and discharge of claims of some of the depositors, for that, upon payment of plaintiff's claim in full, she no longer has cause to complain.

Thus the alternative writ, restraining the payment of common and unsecured claims of creditors until plaintiff's claim is paid in full, is made permanent. Costs to the plaintiff.

ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

MOFFAT, Justice.
I concur in the result making the writ permanent.