[L. A. No. 22287.   In Bank.   Sept. 18, 1953.]

RICHARD E. WOTTON et al., Appellants, v. R. D. BUSH, as State Oil and Gas Supervisor, etc., et al., Respondents.

462

Dolley, Knight, Woods & Hightower and James M. Hall for Appellants.

William Kinley, George E. Wise and Simpson & Wise as Amici Curiae on behalf of Appellants.

Edmund G. Brown, Attorney General, and John F. Hassler, Deputy Attorney General, for Respondents.

Pillsbury, Madison & Sutro, Turner H. McBaine and James L. Wanvig as Amici Curiae on behalf of Respondents.

SHENK, J.—This is an appeal from a judgment for the defendants in an action seeking declaratory relief. A determination is sought to establish that the plaintiffs' real property is located within the Rosecrans Oil Field in Los Angeles County and for that reason may be drilled and placed in production without first complying with the spacing provisions of chapter 3, division 3 of the Public Resources Code (spacing of wells and community leases). Section 3605 of that chapter provides: "The provisions of this chapter do not apply to any field producing oil or gas on August 14, 1931." The Rosecrans field was producing oil or gas on the designated date. However, the trial court found that the plaintiffs' property was not in the Rosecrans Oil Field but lay within a new field called the Howard Townsite Field, and that the plaintiffs must comply with the spacing provisions.

At the trial there was substantial evidence to the effect that the Rosecrans and the Howard Townsite areas were different fields; that they were separated by an economically unproductive area; that they were separated geologically by a fault; that there was no drainage across or over the fault; that the regulation of production in one area would have no effect on production in the other; and that since the first discovery well in the Howard Townsite area in 1947 it had been the administrative practice of the Division of Oil and Gas with regard to approximately 20 wells since drilled therein to treat that area as a new oil field. There was evidence to the effect that the two productive areas were merely parts of the overall Rosecrans Oil Field. In the face of this conflict the trial court found that the plaintiffs' property, comprising less than an acre in area, lay outside of the Rosecrans field and in a new field of production.

It is argued on appeal that the provision of section 3605, set forth above, is unconstitutional for two reasons, both of which relate to the meaning of the term "field" as used in that section. It is argued first that the section is void for uncertainty, and secondly that by leaving to an administrative body (the Division of Oil and Gas) the determination of what constitutes a "field producing oil or gas" there has been an improper delegation of legislative power.

The Oil Well Spacing Act, as it is known, was enacted in its present form in 1947 (Stats. 1947, p. 3200; Pub. Resources Code, §§ 3600 to 3608, incl.). However, sections 3600 through 3605 have existed in substantially the same language since 1931 (Stats. 1931, p. 1277). In general the act prohibits the drilling for or production of oil or gas on a parcel of land smaller than a certain minimal size (substantially one acre) in fields which were not producing on August 14, 1931. By the provisions of section 3608 such a parcel of land "shall, for oil and gas development purposes and to prevent waste and to protect the oil and gas rights of landowners, be deemed included" in a community lease with surrounding land to constitute a leasehold large enough to be drilled upon. Provision is made for the declaration of such a leasehold and pro rata shares in the community production. In *Hunter* v. *Justice's Court* (1950), 36 Cal.2d 315 [223 P. 2d 465], this court upheld the constitutionality of those portions of the act relating to the production of oil and gas in areas not producing in 1931 but did not find it necessary to consider the constitutional question raised in the present case.

It is established that "a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." (*Connally* v. *General Constr. Co.*, 269 U.S. 385, 391 [46 S.Ct. 126, 70 L.Ed. 322]; see, also, *Small Co.* v. *American Sugar Refining Co.*, 267 U.S. 233 [45 S.Ct. 295, 69 L.Ed. 589].) In the present case the Legislature has not defined the phrase "field producing oil or gas." The dictionary defines a "field" as a "natural area or section of land containing or yielding some particular, esp. mineral, resource; as . . . an oil field." (Webster's New Internat. Dict., 2d ed., 1935, p. 941.) The Legislatures in other states have undertaken to define the terms used in connection with oil legislation. For example, the following is an excerpt from the General Laws of Mississippi, 1948, chapter 256, section 4: ". . . (e) 'Pool' shall mean an underground reservoir containing a common accumulation of oil or gas, or both. Each zone of a general structure which is completely separated from any other zone in the structure, is included in the term 'pool' as used herein. (f) 'Field' shall mean the general area which is underlaid or appears to be underlaid by at least one pool; and 'field' shall include the underground reservoir or reservoirs containing oil or gas or both. The words 'field'

and 'pool' mean the same thing when only one underground reservoir is involved; however, 'field', unlike 'pool', may relate to two or more pools."

██ In the light of legislative enactments elsewhere, general practices and understanding it is reasonable to conclude that the term "field" has been given a meaning susceptible to proof by evidence of common usage in the industry. ██ In this case an expert witness for the plaintiffs, Dr. Robin Willis, stated that a "layman understands an oil field, as a general rule, to be all of a contiguous area, a general area, from which oil is produced. A technical man would be inclined to amplify that to say all of that area from which oil is, has been, or may in the future be produced from a single major causal geological feature." Mr. John R. Pemberton, former Oil Umpire for the petroleum industry, stated: "My understanding of an oil field is that it comprises a distinct and isolated structural uplift of the type in which oil will accumulate . . . it . . . may be all split up, broken by faults of all kinds . . . An oil field, as such, is not entirely, but it is more or less, a geographical term. It refers to an area."

On behalf of the defendants Dr. Luis E. Kemnitzer testified that in his estimation, "the term 'oil field' should be governed by the economics of the situation"; that it should be considered as an area in which continuous and contiguous production is obtained, and "that the limits of this oil field are those established by the dry holes or uneconomic production." John H. Wents, Jr., stated: "I define an oil field as simply the surface area used in exploitation of an underground pool or pools of oil. An oil field is bounded by an uneconomic production or dry holes." Mr. E. H. Musser, Deputy State Oil and Gas Supervisor and one of the named defendants, stated that for "the purpose of our work, however, we have taken an oil field to mean, in general, a producing area . . ."

The plaintiffs contend that the concepts expressed by the witnesses show a lack of uniformity and are irreconcilable. But the record does not indicate that the definitions are necessarily inconsistent. Defendant Musser's "producing area" is not inconsistent with the areas defined with reference to economic limits by the defendants' other experts. Nor is it materially different from the geographical "area" of the plaintiffs' witness Mr. Pemberton, or the layman's concept of "a contiguous area, a general area, from which oil is produced" according to the plaintiffs' witness, Dr. Willis. Nor is there anything in the record to show that the "distinct

and isolated structural uplift" described by Mr. Pemberton is inconsistent with the "economic limits" depended upon by the defendants. Dr. Willis stated that "a major causal geological feature," as he described a field, could relate to a productive area which was not always defined by economic limits. He referred to a situation where two distinct fields overlapped at different levels and productivity would therefore be continuous between the fields.

In general the disagreement in terminology between the parties was directed to the specific problem before the trial court—the determination of whether the plaintiffs' property lay within the Rosecrans field. The parties agreed that this property was separated from the main Rosecrans field by an area of uneconomic production.

Under the circumstances of this case it is proper that the administrative construction given to section 3605 since its enactment in 1931 be considered as an aid in determining the meaning of the statute. In *Richfield Oil Corp.* v. *Crawford,* 39 Cal.2d 729 [249 P.2d 600], the interpretation of other terms in the Oil Well Spacing Act was before the court. It was held that "The contemporaneous administrative construction of the enactment by those charged with its enforcement and interpretation is entitled to great weight, and the courts generally will not depart from such interpretation unless it is clearly erroneous or unauthorized." An administrative officer of the Division of Oil and Gas testified that the administration of the act had at first been difficult because of the absence of a precise legislative definition of an "oil field"; that later the matter of drainage into or out of a region had been given prime consideration in settling upon a criterion; that a field had come to be considered as that expanded area from the region of initial production to the limits of productivity in all lateral directions; and that within a given field there was no structural connection or drainage to or from other fields. He testified that in general this had been the consistent interpretation of the division and others in the industry, and that by its application the Howard Townsite area had been determined to be a new field long before the plaintiffs had expressed a desire to drill in that area.

The plaintiffs contend that the Division of Oil and Gas has not consistently applied its asserted interpretation with respect to the present inquiry. They rely upon certain maps, publications and letters as evidence that the division has not consistently considered the Howard Townsite area to be out-

side the Rosecrans field. Mr. Musser testified on several occasions that the publications were compiled for the convenience of the division in its filing and statistical requirements (and some of the publications so indicate), and did not purport to define the limits of the various fields depicted thereon; that the maps showed other fields expanded much beyond their recognized limits for the same reason; that approximately 20 other wells were drilled in the Howard Townsite area in conformity with the spacing regulations, and that the division's maps issued since the commencement of the present action but on which the work had begun prior to that time showed the Howard Townsite area as a separate field. This question was resolved by the trial court in favor of the defendants by the finding that the plaintiffs' property was not in the Rosecrans field. Other contentions to the effect that the division has not consistently applied its interpretation in factual situations similar to that of the present case are not supported by the record. It may not be said that as a matter of law there has not been a consistent administrative interpretation.* ▮ The burden, of course is on those attacking the statute to show that its application to the circumstances of the particular case is unwarranted.

▮ The interpretation given section 3605 by the Division of Oil and Gas is aided by the rule "that the objective sought to be achieved by a statute as well as the evil to be prevented is of prime consideration in its interpretation." (*Rock Creek Water Dist.* v. *County of Calaveras*, 29 Cal.2d 7, 9 [172 P.2d 863]; see, also, *Richfield Oil Corp.* v. *Crawford, supra*, 39 Cal.2d 729, 738.) Among the purposes of the Oil Well Spacing Act is to "prevent waste and to protect the oil and gas rights of landowners" (Pub. Resources Code, § 3608). In *Hunter* v. *Justice's Court, supra*, 36 Cal.2d 315, it was said at pages 317 and 318 that section 3608 was adopted to provide a means by which the small landowner might "prevent the drainage of the underlying oil basin by wells on adjacent lands . . . It is the settled rule that 'a state has constitutional

---

*The record reveals that the Division of Oil and Gas has been confronted with varying situations, depending largely on differences in geological formation. The division's practice must necessarily vary as these different formations are encountered. In one case, the Montebello Oil Field in the Los Angeles Basin was producing on August 14, 1931, and new wells drilled in that field were not made subject to the spacing regulations. Thereafter a field recognized by experts as a new field was discovered underlying a small portion of the old field but 2500' below it. The two fields were not separated by an area of uneconomic production. The division did not apply the spacing regulations in the new field.

power to regulate production of oil and gas so as to prevent waste and to secure equitable apportionment among landholders of the migratory gas and oil underlying their land . . .' (*Hunter Co.* v. *McHugh*, 320 U.S. 222, 227 [64 S.Ct. 19, 88 L.Ed. 5] . . .)'' █ Where the object of the statute is to secure equitable apportionment of migratory oil and gas it is clear that measures taken in a particular region beyond or into which there can be no migration will have no effect whatsoever on an adjacent similar region. █ The exception of section 3605 by which the spacing regulations are not applied in a region producing on August 14, 1931, should apply uniformly to the whole of that region into or from which there is no migration or drainage if the objective of the statute is to be accomplished. █ Similarly, in a region where wells are subject to spacing regulations the limits of that region should extend to the limits of migration or drainage, if the objective of the act is to be achieved. Such regions are consistent with the asserted administrative interpretation of the term "field."

█ Indefiniteness in statuory terminology may be tested as an invalid delegation of power as well as a denial of due process. (*United States* v. *Cohen Grocery Co.*, 255 U.S. 81 [41 S.Ct. 298, 65 L.Ed. 516].) █ The delegation of an absolute legislative discretion to an administrative body is not proper, but if the delegating statute establishes an ascertainable standard to guide the administrative agents no objection can properly be made to it.

In the present case the question of whether sufficient criteria have been provided by the Legislature to guide the Division of Oil and Gas in applying or withholding spacing regulations with regard to a particular well is interrelated with the question of the vagueness of the expression "any field producing oil or gas on August 14, 1931." As has been seen, the statute seeks to achieve objectives which can only be gained by consistently applying an interpretation to it which an administrative body could and did settle upon. It should be noted that 16 years after the Oil Well Spacing Act had been enacted and during which time it had been applied, it was added to and reenacted with no change in section 3605. (Stats. 1947, p. 3200.) █ Settled administrative interpretation at the time of such reenactment is entitled to consideration as legislative approval of that interpretation, and as having established a limit within which the administrative action was intended to be confined. (*Richfield Oil Corp.* v. *Crawford,*

*supra,* 39 Cal.2d 729, 736; *Mudd* v. *McColgan,* 30 Cal.2d 463, 471 [183 P.2d 10]; *Nelson* v. *Dean,* 27 Cal.2d 873, 882 [168 P.2d 16, 168 A.L.R. 467].)

The administration of oil and gas conservation statutes is a difficult problem because conditions are continually changing. It may well be that the Legislature did not desire to lay down minutely defined standards in the interest of providing for flexibility. The Legislature cannot and need not anticipate every situation that may arise. (See *Hampton & Co.* v. *United States,* 276 U.S. 394, 407-408 [48 S.Ct. 348, 72 L.Ed. 624].) In *First Industrial Loan Co.* v. *Daugherty* (1945), 26 Cal.2d 545, 549 [159 P.2d 921], the court stated that "The essentials of the legislative function are the determination and formulation of the legislative policy. Generally speaking, attainment of the ends, including how and by what means they are to be achieved, may constitutionally be left in the hands of others. The Legislature may, after declaring a policy and fixing a primary standard, confer upon executive or administrative officers the 'power to fill up the details' by prescribing administrative rules and regulations to promote the purposes of the legislation and to carry it into effect . . ."

Bearing in mind the overall objective of the statute, the administrative practice and the evidence in this case it must be concluded that the expression "field producing oil or gas" has an understandable meaning in the industry and that it is not void for uncertainty. It must also be concluded that the Division of Oil and Gas has applied the phrase to mean a subterranean region into which or from which there is no lateral drainage; that the surface of such a region is ascertainable by limits of uneconomic production, and that such a construction is reasonable and proper. At the time of the reenactment of the statute in 1947 there had been a consistent application of this administrative construction in similar factual situations for a period of 16 years. It must be assumed that the Legislature intended this settled construction to establish a standard within which administrative action would continue to be exercised. The delegation of power by the 1947 reenactment was thus limited by sufficient criteria to avoid any implication that it was an unlawful delegation of legislative discretion.

The judgment is affirmed.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.