[S. F. No. 19317. In Bank. Dec. 29, 1955.]

GENERAL ELECTRIC COMPANY, Petitioner, v. THE SUPERIOR COURT OF ALAMEDA COUNTY, Respondent; AFFILIATED GOVERNMENT EMPLOYEES DISTRIBUTING COMPANY, INC., Real Party in Interest.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson and Everett A. Mathews for Petitioner.

No appearance for Respondent.

Butterworth & Smith, Dudley H. Nebeker, Edward L. Butterworth, Leonard S. Wolf and F. Walton Brown for Real Party in Interest.

SHENK, J.—This proceeding in prohibition was commenced by the General Electric Company to prevent the enforcement by the respondent superior court of its order requiring the petitioner to produce certain of its books and records for inspection by the real party in interest, the Affiliated Government Employees Distributing Company, Inc. The order was made pursuant to discovery procedures (Code Civ. Proc., § 1000) in an action by the petitioner for an injunction under the Fair Trade Act of 1931 as amended in 1933 and 1941 (Bus. & Prof. Code, §§ 16900-16905) to enjoin the retail sale of its products by the real party in interest at prices below those alleged to have been established in compliance with the terms of the act.

The defendant's answer in the basic action set forth a number of defenses. The fifth affirmative defense alleged, on information and belief, that the petitioner "has arbitrarily and capriciously fixed the fair trade prices of its commodities far in excess of the cost of manufacturing and distributing the commodities and has unlawfully and inequitably used the Fair Trade Act to provide an arbitrary and unreasonable margin of profit on the sale to the public of its Fair Traded articles"; that "by virtue of the aforesaid conduct, plaintiff has used the Fair Trade Act in a manner detrimental and injurious to the public good and welfare, and has engaged in inequitable conduct which precludes it from seeking relief in a court of equity." Upon that defense and in contradiction of an affirmative allegation of the complaint that the petitioner's products are in fair and open competition with the same class of goods produced by others, as required by the Fair Trade Act (Bus. & Prof. Code, § 16902), the attorney for the real party in interest moved for and was granted the contested order requiring the petitioner to produce its cost accounting records. His motion was supported by his affidavit in which he stated that at the trial he would introduce evidence to prove that petitioner had arbitrarily and unreasonably established the price of its commodities far in

excess of the cost of manufacturing and distribution, for which purpose he required access to the petitioner's records.

█ The order from which relief is sought in this proceeding is not appealable and prohibition is available. (*Holm v. Superior Court*, 42 Cal.2d 500, 505 [267 P.2d 1025, 268 P.2d 722] ; *City & County of San Francisco v. Superior Court*, 38 Cal.2d 156 [238 P.2d 581].)

The precise question is whether the petitioner's profits are material to any issue presented in the basic action. If so, there appears to be little question but that the petitioner's records are subject to discovery procedures in spite of the physical burden under which the petitioner may be placed (*Milton Kauffman, Inc. v. Superior Court*, 94 Cal.App.2d 8 [210 P.2d 88]), or the disclosure of its claimed confidential manufacturing and business practices which may result thereby (see Code Civ. Proc., § 1000; *I.E.S. Corp. v. Superior Court*, 44 Cal.2d 559, 563 [283 P.2d 700] ; *Holm v. Superior Court, supra*, 42 Cal.2d 500). On the other hand, if manufacturer's profits cannot be shown to be material to any issue pertinent to an action under the Fair Trade Act the trial court lacked the power to order the production of the records.

No provision of the act expressly mentions or puts any profit question in issue. There are two general grounds for the materiality of the records sought. It is claimed first that the records will show that the petitioner, in seeking the aid of a court of equity to restrain the real party in interest from selling for less than the established fair trade prices came into court with ''unclean hands'' because of the alleged unreasonably high margin of profit made possible by procedures undertaken pursuant to the act, and that proof of such claims would constitute a defense to the main action under general principles of equity. Reliance is placed on *Sunbeam Corp. v. Marcus*, 105 F.Supp. 39, wherein it is stated, with reference to the showing a manufacturer must make to establish his right to relief under the New York Fair Trade Laws, that ''Under equitable principles the plaintiff [manufacturer] has not indulged practices offensive to the conscience of the Court—that he comes into equity with clean hands.'' Nowhere in that decision, however, nor in any decision cited or discovered (see *Julius Schmid, Inc. v. McKay*, 203 Okla. 502 [223 P.2d 529], where a similar contention was made but not passed upon) has the manufacturer's margin of profit been considered indicative of unclean hands. █ Traditionally the doctrine of unclean hands is invoked when the

one seeking relief in equity "has violated conscience, or good faith, or other equitable principle, in his prior conduct." (*DeGarmo* v. *Goldman*, 19 Cal.2d 755, 765 [123 P.2d 1], quoting from Pomeroy's Equity Jurisprudence, § 397.)

■ Where, as here, the Legislature has not limited the price which a producer under the act may demand for his product, nor made the amount of his profits an element to be considered in making contractual arrangements on resale (see *Scovill Mfg. Co.* v. *Skaggs Pay Less Drug Stores, ante*, p. 881 [291 P.2d 936]), it does not appear to be within the province of the court to interject into the act such a provision by resort to the doctrine of unclean hands. (See *Kofsky* v. *Smart & Final Iris Co.*, 131 Cal.App.2d 530 [281 P.2d 5].)

A case closely in point on the issue of the materiality of the records to charges of unclean hands is *Sunbeam Corp.* v. *Central Housekeeping Mart, Inc.* (1954), 2 Ill.App.2d 543 [120 N.E.2d 362]. In that case a defendant retailer against whom a plaintiff manufacturer successfully invoked the injunctive provisions of the Illinois Fair Trade Act alleged that the plaintiff's margin of profits between cost of production and retail price "was more than 200%." In holding that the Illinois Fair Trade Act did not provide for an inquiry into prices, the court stated that "We need not decide whether there is no case in which equity could not inquire in the public interest whether an excessive margin of profit had resulted in an extortionate retail price to the consumer. It is enough to say that this charge does not here make an issue which would justify such an inquiry." (See also *Guerlain, Inc.* v. *F. W. Woolworth Co.*, 170 Misc. 150 [9 N.Y.S.2d 886].)

As the second ground for the materiality of the records it is contended that an inspection is necessary to determine the differential between production costs and retail prices. These are claimed to be material to the issue whether the petitioner's products are in "fair and open competition with commodities of the same general class produced by others" (Bus. & Prof. Code, § 16902), and to other related issues raised by the pleadings. The real party in interest would infer the existence of a competition-destroying conspiracy between producers in the field if the profits of the petitioner proved to be unreasonably high. It was said in *Scovill Mfg. Co.* v. *Skaggs Pay Less Drug Stores, supra, ante*, p. 881 [291 P.2d 936], that " 'Fair and open' relates only to the manner of competing, not to the results. If economic conditions, not the result of unlawful restraints or collusion, prevail to create a favorable market to the producer or retailer, no reason

appears why the statute does not apply. There is no require-
ment concerning a reasonable price level . . .'' A de-
termination of the petitioner's profits alone, if possible from
the records sought, would not constitute substantial proof
of either a conspiracy or an absence of fair and open com-
petition. It is apparent at once that any examination into
the question of fair and open competition requires an investi-
gation of market conditions much broader in scope than
the cost records of an individual producer. (See *Eastman
Kodak Co.* v. *Federal Trade Com.*, 158 F.2d 592.) The present
petition is supported by exhibits which indicate that there
are 16 other producers engaged in the manufacture and
sale of competing electrical appliances. The real party in
interest does not deny that there are such producers in the
field and makes only an academic argument that fair and
open competition might not exist.

From the foregoing it is apparent that the petitioner's cost
records have not been shown to be material to any issue
presented in the basic action. The peremptory writ is there-
fore granted.

Gibson, C. J., Carter, J., Traynor, J., and Spence, J.,
concurred.

SCHAUER, J., Dissenting.—The practice of permitting a
manufacturer (at least absent any contractual relationship) to
arbitrarily fix a price below which his product may not be
sold by one who acquires title to it is basically contrary to
the concept of free enterprise under a government dedicated
to liberty and freedom and to the protection of private owner-
ship rights wherein even land titles are alodial. As expressed
by the court in *Union Carbide & Carbon Corp.* v. *White River
Distributors, Inc.* (1955), —— Ark. —— [275 S.W.2d 455,
458], ''Full and free competition is the long recognized basis
of our economy. Trade-marked articles comprise a large num-
ber of the commodities in common use today and it is common
knowledge that the number is increasing. . . . We can think
of no way in which the public welfare was being jeopardized
under the system of free competition prior to 1937 which
suggested the necessity or advisability of imposing the [non-
signer] restrictions contained in Act 92 [the State's Fair
Trade Act], and we can think of none that exists today. To
the contrary, we believe it is generally recognized that the
interest of the public is best served by the opportunity to buy

commodities in a freely competitive market. We recognize that competition is preserved to a degree under the provisions of the Act, but it must be admitted that it is also restricted to a degree. The Act can be sustained only if it enhances the. general welfare and not if it restricts it to only a small extent . . . [We conclude] that the effect of the Act is not to protect the public welfare and therefore violates our Constitution.''

And in Georgia the court, in striking down as unconstitutional the nonsigner provisions of the State's Fair Trade Act, declared in *Cox* v. *General Electric Co.* (1955), 211 Ga. 286 [85 S.E.2d 514, 519], that ''We are here . . . dealing with the statutes of this State and with the question of whether or not they violate the Constitution of the State of Georgia. What the courts of other States have decided is not controlling . . . We are also familiar with the modern trend to allow the government to encroach more and more upon the individual liberties and freedoms. So far as we are concerned, we will not strike down the Constitution of our State for this purpose . . . The scheme described in the petition now under consideration permits a manufacturer, under the guise of protecting his property rights in a trade name and trademark, to control the price of his product down through the channels of trade into the hands of the ultimate consumer, and into the hands of persons with whom he has no contractual relation whatever. This statute clearly violates the provisions of the due-process clause of the Constitution of the State of Georgia.''[1] (See also *Grayson-Robinson Stores* v. *Oneida, Ltd.* (1953), 209 Ga. 613 [75 S.E.2d 161, 165]; *McGraw Electric Co.* v. *Lewis & Smith Drug Co.* (1955), 159 Neb. 703 [68 N.W. 2d 608, 616-618]; *Liquor Store, Inc.* v. *Continental Distilling Corp.* (1949, Fla.), 40 So.2d 371, 374-375; *Shakespeare Co.* v. *Lippman's Tool Shop Sporting Goods Co.* (1952), 334 Mich. 109 [54 N.W.2d 268].)

In *Liquor Store, Inc.* v. *Continental Distilling Corp.* (1949, Fla.), *supra*, it was likewise concluded ''that the [Fair Trade] act is arbitrary and unreasonable and violates the right to own and enjoy property; one economic group may not have the sovereign power of the state extended to it and use it to the detriment of other citizens. In that case the legislation serves a private rather than a public purpose. The sovereign

---

[1]Georgia Constitution of 1945, article 1, section 1, paragraph 3: ''No person shall be deprived of life, liberty, or property except by due process of law.''

power must not be delegated to a private citizen to be used for a private purpose and especially where there is no state supervision."

It is my view that the nonsigner provisions of the California Fair Trade Act (Bus. & Prof. Code, § 16904) are similarly aribtrary, unreasonable and violative of the due process clause of the Constitution of California. (Const., art. I, § 13,[2] see also § 1.)

That price-fixing practices would be contrary to the generally declared public policy in the absence of specific authorization is recognized by this court in both *Max Factor & Co.* v. *Kunsman* (1936), 5 Cal.2d 446, 455 [55 P.2d 177], and in *Scovill Mfg. Co.* v. *Skaggs Pay Less Drug Stores, ante,* p. 881 [291 P.2d 936] (S. F. 19068). In the latter case it is stated (*ante,* p. 884), "The sales contemplated . . . are transactions which have a substantial effect upon interstate commerce, and in the absence of federal statutory exemptions the contracts imposing fair trade arrangements on such transactions would be in violation of the Sherman Anti-Trust Act. (26 Stats. 209 [1890].) However, the Miller-Tydings Amendment thereto (50 Stats. 693 [1937]; 15 U.S.C.A.,§§ 1-7) provides for such an exemption in the case of voluntary arrangements and in the McGuire Act (66 Stats. 632 [1952]; 15 U.S.C.A., § 45[a]) Congress extended the exemption to nonsigner provisions of such contracts entered into pursuant to state statutes."

In the Scovill case the majority of this court rely heavily upon the Max Factor decision. A basis of that decision was the alleged cutting of prices to the point where sales of certain trademarked products were being made at a loss, a situation which as a matter of common knowledge was generally brought about by severely depressed economic conditions. The avoidance of such price-cutting practices was said to be promotive of public welfare. This statement must be understood to have been used in the light of the economic conditions then existing. However, it is plain that a prop upon which a so-called fair trade law could be sustained during the meager days of the 1930's would not necessarily be persuasive now. All manner of ideas were conceived during that period, in desperate moves to help the ailing economy. The Fair Trade Act was a product of that condition (see

---

[2]Const., art. I, § 13: ". . . No person shall be . . . deprived of life, liberty, or property without due process of law . . .''

*Liquor Store, Inc.* v. *Continental Distilling Corp.* (1949, Fla.), *supra,* 40 So. 2d 371, 374) and was sustained because of the entirely proper concept that the people should be given a large latitude to experiment within the framework of their Constitution, and that laws which might be sustainable as designed to cope with an emergency would become invalid if sought to be applied under materially different conditions. With the termination of the depression such an act no longer has any proper place in the workings of a free and competitive economy and whether it remains constitutionally tenable is a question which should be reexamined, not held to be concluded by the prior decision.

In the Scovill case this court recognizes that (*ante,* pp. 885, 886), "It is urged, however, that the changing economic conditions and circumstances since the decision in the Max Factor case as well as experience in the application of fair trade acts since that time have resulted in a general acknowledgment that such legislation no longer serves a proper purpose, and that a trend of recent decisions in other states requires a reexamination of the constitutional questions involved. . . . In five states the highest courts have held their fair trade acts to be partially or totally invalid. (*Liquor Store, Inc.* v. *Continental Distilling Corp.* (1949, Fla.), 40 So.2d 371; *Grayson-Robinson Stores Inc.* v. *Oneida, Ltd.* (1953), 209 Ga. 613 [75 S.E.2d 161]; *Shakespeare Co.* v. *Lippman's Tool Shop Sporting Goods Co.* (1952), 334 Mich. 109 [54 N.W.2d 268]; *McGraw Electric Co.* v. *Lewis & Smith Drug Co.* (1955), 159 Neb. 703 [68 N.W.2d 608]; *Union Carbide & Carbon Corp.* v. *White River Distributors, Inc.* (1955), —— Ark. —— [275 S.W.2d 455].)'' The first of the above-quoted decisions (*Liquor Store, Inc.* v. *Continental Distilling Corp.*) turned largely upon changing economic conditions. In that case it is further pointed out (p. 375 of 40 So.2d) that when fair trade legislation was first promulgated its purpose was to protect long established brands which had acquired a substantial value, and that thereafter new brands by the thousands were created to take advantage of the price-fixing privileges thereby secured. (See also *Union Carbide & Carbon Corp.* v. *White River Distributors, Inc.* (1955, Ark.), *supra,* 275 S.W.2d 455, 458.) The fallaciousness of the alleged public welfare purposes of the act is thus further demonstrated.

In the Scovill case the majority notes that various contentions which are now urged against the validity of the Fair Trade Act were not disposed of in the Max Factor case.

For example, the attack on the basis of an unlawful delegation of legislative power to fix prices was not there considered, nor did the court take up the problem of indefiniteness of the expression "fair and open competition," as that phrase is used in the act. In both *McGraw Electric Co.* v. *Lewis & Smith Drug Co.* (1955, Neb.), *supra*, 68 N.E.2d 608, 617-618, and *Liquor Store, Inc.* v. *Continental Distilling Corp.* (1949, Fla.), *supra*, 40 So.2d 371, 375, it was held that fair trade legislation effected an unconstitutional and illegal delegation of price-fixing powers to private parties which even the Legislature itself did not possess as to commodities not affected with a public interest, and particularly was the delegation unlawful in the absence of state supervision of the prices. It is my view that such holdings are based upon sound and long-established constitutional principles and should be followed by this court. Further, this court has held to be fatally vague the expression "reasonable profit" as used in an attempted statutory exception (added by amendment) to the provisions of the Cartwright Act (Bus. & Prof. Code, §§ 16700-16758) forbidding combinations in restraint of trade. (*People* v. *Building Maintenance, etc. Assn.* (1953), 41 Cal.2d 719, 723-726 [264 P.2d 31] ; *Speegle* v. *Board of Fire Underwriters* (1946), 29 Cal.2d 34, 46-48 [172 P.2d 867] ; see also *Wotton* v. *Bush* (1953), 41 Cal.2d 460, 464, 468 [261 P.2d 256].) The phrase "fair and open competition" appears equally vague and indefinite as it is used in the Fair Trade Act, and thus renders the act vulnerable as an invalid delegation of power as well as a denial of due process. (See *Wotton* v. *Bush, supra*, p. 468.)

As noted hereinabove, the fair trade legislation was inspired by and originally sustained because of the greatest economic depression in history. According to the daily press, present economic conditions are the most prosperous that the nation has ever known. The purpose of the petitioner here is to escape disclosing evidence pertaining to its business as related to the commodity in question, in a proceeding in which it is invoking the equitable powers of the court. It is my view that under such circumstances one of the factors which could well be examined by this court in determining whether or not the legislation may properly be further sustained, as well as in determining the equities of petitioner's claim, is whether it is operating to permit manufacturers, and is being used by this petitioner, to exact arbitrarily high and unreasonable profits, rather than serving its originally

avowed purpose of promoting the public welfare. To that end the real party in interest herein seeks to adduce evidence to show the manufacturer's profit margin in defense to the equitable remedy of injunction sought by the manufacturer as plaintiff in the main action. I agree with the real party in interest that proof of sales of a commodity at an exorbitantly high price in relation to the cost of manufacture would tend to evidence that the commodity is not in fair and open competition, that the Fair Trade legislation protecting such arbitrarily fixed high prices is not promotive of public welfare, and that the manufacturer is using such legislation for unlawful and inequitable purposes and to impose upon the consuming public and upon nonsigning retailers an inequitable and illegal price maintenance scheme. It seems to me that the evidence here sought to be adduced is clearly relevant to the issues which the manufacturer has raised by its own request for assistance from a court of equity.

I would deny the writ sought.

Edmonds, J., concurred.