169 Cal.App.2d 188 (1959)
SULTAN TURKISH BATH, INC. (a Corporation), Appellant,
v.
BOARD OF POLICE COMMISSIONERS OF THE CITY OF LOS ANGELES, Respondent.
Civ. No. 23122. 
California Court of Appeals. Second Dist., Div. Three. 
Mar. 27, 1959.
 Wirin, Rissman & Okrand, Fred Okrand, Danning & Bartfield and Irvin S. Bartfield for Appellant. *191
 Roger Arnebergh, City Attorney, Philip E. Grey, Assistant City Attorney, and D. H. von Wittenburg, Deputy City Attorney, for Respondent.
 VALLEE, J.
 The Board of Police Commissioners of Los Angeles revoked the 1956 permit of Sultan Turkish Bath, Inc., to conduct a Turkish bath, and denied its application for a 1957 permit. The appeal is from a judgment denying a writ of mandate to compel the board to annul its order and to grant a permit for 1957.
 Section 27.02 of the Los Angeles Municipal Code provides for the licensing of Turkish baths through an annual permit issued by the board. Section 27.02(c) provides:
 "It shall be the duty of the Board, in addition to the other penalties provided by this Code, to revoke such permit whenever it shall appear to the Board that such business has been carried on under said permit in an unlawful, improper or irregular manner."
 A permit may be renewed on the filing of an affidavit by the permittee stating he has conducted the business in a proper, regular, and lawful manner. The board has the power to deny an application for renewal "for any ground which would have justified a denial of the original application for a permit."
 The complaint against Sultan alleged:
 "(a) Said business has been carried on under said permit in an unlawful, improper and irregular manner, to wit:"
 "(1) Said business has been carried on in such a manner as to constitute a public nuisance;"
 "(2) Said business has been carried on in such a manner as to permit patrons to engage in conduct which is indecent, lewd, lascivious and prohibited by law. A list of such patrons, the date and nature of the conduct is attached hereto as "Schedule A" and incorporated herein by reference."
 "[Schedule A]"
 "(3) Permittees have knowingly refused and failed to take proper precautions to prevent the occur[r]ence of the acts complained of in said attached 'Schedule A';"
 "(b) The operation of said business under said permit does not comport with the public welfare, to wit:"
 "(1) Said business has been carried on in such a manner as to constitute a public nuisance;"
 "(2) Said business establishment is a hangout for male *192 degenerates of all types who have committed on the premises indecent, lewd, lascivious acts prohibited by law. A list of such male degenerates who have committed said acts together with the date and nature thereof is attached hereto as 'Schedule A' and incorporated herein by reference."
 The hearing examiner who heard the evidence reported to the board:
 "A. The Department's exhibits as well as the testimony of the officers have proved by substantial evidence of numerous arrests and a number of convictions of patrons of the respondent bathhouse on charges, including vag. lewd (Penal Code 647.5), Sex perversion (Penal Code 288a), and Sodomy (Penal Code 286). The arrests referred to at Respondents premises covered a period from March, 1956, to and including May, 1957. They present a continuous pattern of lewd and immoral acts by patrons of Respondents during that period of time."
 "The Respondents have, by evidence presented, shown that they employ watchmen to check the dressing rooms where most of the illegal acts occur, that they have peepholes in the dressing room doors and try to prevent loitering or more than one man in a room. Respondents further have presented evidence and testified that they do not knowingly allow any sexual perverts on the premises or permit the illegal and immoral activities referred to above. Further, that at the request of respondents, this Examiner in the presence of Respondents' counsel and Sergeant L. H. Reiner, visited Respondents' premises."
 "B. It is the opinion of this Examiner that there is a continuous pattern of illegal sexual and immoral acts committed by some of the patrons of Respondents' bathhouse who use the bathhouse as a place to meet and congregate, and that although Respondents have attempted to prevent this illegal activity, they have not been successful."
 The hearing examiner found:
 "A. That the arrests referred to in the complaint, particularly Paragraph III thereof, Department's Exhibit 1, occurred at Respondents' premises on the dates referred to and on charges, including vag. lewd (Penal Code 647.5), sex perversion (Penal Code 288a), and sodomy (Penal Code 286)."
 "B. That the convictions of some of the persons on the charges above referred to occurred as testified to by the Police Officers and as contained in Department's Exhibits 4 through 7."
 "C. That Respondent corporation employs watchmen to prevent the occurrence of illegal activities on the premises *193 and does not knowingly permit illegal, immoral acts but that such acts notwithstanding have continuously occurred."
 "D. That Respondents' business as alleged in the complaint has been carried on in such a manner as to permit patrons to engage in conduct which is indecent, lewd, lascivious, and prohibited by law."
 "E. That as alleged in the complaint, Paragraph III thereof, that Respondents' business has been carried on in an unlawful, improper and irregular manner, and that the operation of said business under Police permit does not comport with the public welfare."
 He recommended to the board that Sultan's permit for 1956 be revoked and that its application for a 1957 renewal be denied.
 After notice to Sultan, the board conducted a hearing on the report and recommendations of the hearing examiner, at which written exceptions were presented; and counsel for Sultan, Louis Bartfield, its president, and the chief investigator of the board made statements. The findings and recommendations of the hearing examiner were adopted by the board as its decision. A request for reconsideration was denied. Thereafter the superior court denied a writ of mandate after reviewing the record before the board. Sultan appeals, contending first that the evidence does not support the order of the board.
 [1] The board of police commissioners, acting as a quasi-judicial body, is empowered "to make final adjudications of fact in connection with matters properly submitted to it." (English v. City of Long Beach, 35 Cal.2d 155, 158 [217 P.2d 22, 18 A.L.R.2d 547].) [2] On review the "court does not have a right to judge of the intrinsic value of the evidence nor to weigh it. The power of the court is confined to determining whether there was substantial evidence before the board to support its findings." (Odden v. County Foresters etc. Board, 108 Cal.App.2d 48, 49 [238 P.2d 23].) [3] In reviewing proceedings before the board this court is bound to disregard all evidence contrary to that received in support of the findings of the board. (Thompson v. City of Long Beach, 41 Cal.2d 235, 241 [259 P.2d 649]; Chenoweth v. Office of City Clerk, 131 Cal.App.2d 498, 501 [280 P.2d 858].)
 Viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the board and disregarding conflicting evidence and inferences, the record shows these facts: *194
 Sultan Turkish Bath is a corporation. Louis Bartfield is its president and owns half of the stock. Myron Glatt and his mother own the other half of the stock. Bartfield acquired his interests in December 1953; Glatt and his mother acquired theirs about eight months later. Bartfield and Glatt were comanagers. The bath was located in the basement at 607 South Hill Street in Los Angeles. The establishment consisted of a gymnasium, steam room, hot room, showers, massage tables, swimming pool, and lounge. In addition there were 45 booths or "cubicles." Each cubicle contained a cot with a mattress on it, a table, and a chair. An electric light fixture was attached to the wall in each cubicle. The cubicles had plywood doors about 6 feet high, raised about 6 inches from the floor. Holes about an inch in diameter had been drilled into the doors at eye level; about three had half-inch holes; some had three holes in a triangular pattern. Springs had been installed on the doors so they would remain closed. A person inside a cubicle could lock the door. The diagram of the establishment used at the hearing is not in the record.
 The Los Angeles Police Department received numerous complaints of homosexual and sex perversion activities at Sultan. The vice squad of the police department went through the place three and four nights a week. Officer Blakley was there 35 or 40 times between March 1 and July 30, 1957. On about "a fourth to a third of the number of times" he was there he made no arrests. On those occasions "there was hardly no one in the place." He and his partner made about 50 arrests "for Vag Lewd or 288a or Sodomy" between February 1, 1957 and July 30, 1957. He testified that as to those arrested, a number were convicted and he could not recall the disposition of the cases of the others. On July 21, 1957, he made four arrests in the place and did not "see any watchman at all that time." He personally saw the arrestees in immoral acts.
 Officer Blakley told the management to "keep two men out of a booth, take the locks off the doors so there is no opportunity of hiding behind it or locking a door. Things like that. Keep the area well-lighted." In one section the lighting was very poor, one needed a flashlight to get around and see in the cubicles. On Saturdays and Sundays most of the arrests were made in the dark section; during the week arrests "were liable" to be made in any cubicle. Officer Blakley did not recall any time he was there when there were 15 or more registered when he was not "able to make an arrest." *195
 Eleven arrest reports made by Officer Blakley and his partner between February 15, 1957, and May 5, 1957 were identified by him and introduced in evidence. In each instance Officer Blakley or his partner personally saw two men together in an adjoining cubicle engaging in some form of sex perversion.
 Officer Judd testified he was in the establishment two or three times a week between March 1956 and July 26, 1957, except in June 1956; that of those times he made no arrests slightly more than one-third of the times. He further testified: "Q. Have you made any suggestions to him [Louis Bartfield] concerning improvements he might make or additional precaution that he might take in the management of the business? A. Yes, we discussed that, I believe, on two occasions. Q. What was the substance of that conversation? A. Mr. Bartfield asked me if there was anything I might recommend he could do to cut down the number of violations taking place in his establishment, and I suggested, as I recall, brighter lighting which he stated would discourage many of his customers, because they like to come in and sleep overnight. I also mentioned that the doors be kept open, and he stated that was not enough privacy." One light only was changed. He made arrests while the watchman was standing right next to him. Officer Judd testified: One watchman told him that he (the watchman) was doing the best job he could without looking into the booths that were locked. "So I told him my experience was probably 9 out of 10 I made in the place were made from booths where the doors were latched, and in order to break up any illegal activity, he would have to break into the booths, and he said Mr. Bartfield had told him he didn't want them disturbed, because he thought they were sleeping and he thought it was an invasion of their privacy." On one occasion the watchman did not attempt to look into a cubicle which had a towel over the peephole; "he said he wasn't expected to do that by the management." Officer Judd went into the cubicle adjoining which was empty, stood on a cot, looked over, and there was illegal activity inside the cubicle.
 Eight arrest reports made by Officer Judd and his partner between April 21, 1956, and November 27, 1956, were identified by him and introduced in evidence. In each instance but one Officer Judd or his partner personally saw two men together in an adjoining cubicle engaging in some form of sex perversion, *196 and on the other occasion three men engaging in such activity.
 Officer Catlin, assigned to "Central Vice," who had made arrests in Sultan's, identified two arrest reports made by him and his partner with respect to arrests they made on March 18 and 19, 1956. In each instance Officer Catlin observed two men together in an adjoining cubicle engaging in sex perversion.
 Sergeant Sheets, assigned to the police commission investigative staff, testified that when Sultan's application was received he checked the vice files and secured photostatic copies of reports. These reports were introduced in evidence. They showed violations of section 647, subdivision 5, of the Penal Code in the cubicles between December 12, 1956 and May 7, 1957, all at night.
 It appears from the exhibits in evidence that the officers who made the arrests personally observed the criminal activities of those arrested and that they experienced no difficulty in doing so. They located two men in a cubicle by looking through open doors, by looking through the holes in the doors, looking under the doors, by hearing a squeaking cot, by hearing voices in a cubicle, or by going into an adjoining cubicle. On locating two men in a cubicle, they usually went into an adjoining one, stood on the cot or on a chair, looked over the partition, and in each instance saw two men engaging in homosexual activity or sex perversion.
 The hearing examiner, with the consent of Sultan's counsel, viewed the premises.
 [4a] There is no conflict in the evidence that numerous and frequent illegal, immoral, disgusting, and indecent acts were committed on the premises. Bartfield and Glatt knew of their numerous and frequent occurrence. Bartfield was present on occasions when arrests were made. He testified he was not surprised that there were arrests. The management told the watchmen they were not expected to look over the tops of cubicles. The watchmen had no difficulty observing the officers. On one occasion a watchman walked around the place telling the patrons an officer was there. The evidence supports an inference that the illegal, immoral, disgusting, and indecent activities which took place were not mere isolated, casual, unexpected, unpreventable, and uncontrollable incidents, as Sultan would have us hold. It is a reasonable and almost inescapable inference that the owners did not take adequate steps to stop the practices. The board may have reasonably inferred *197 from Bartfield's statement to Officer Judd to the effect that he would not keep the doors on the cubicles open because he wanted his patrons to have privacy, that he was not concerned with what went on in them. Bartfield was willing to sacrifice morality, decency, and lawfulness in order that his patrons have privacy. The board may also have reasonably inferred that if the owners of Sultan had any real intention of conducting the establishment in a lawful, proper, and regular manner, they could have removed the cubicles and made one large room out of the area with cots in it, as exists in most such establishments, with a watchman constantly in the room, if necessary. The board could fairly infer there was inadequate inspection, insufficient lighting in at least one area, loose control of personnel, and improper design.
 [5] The hearing examiner's view of Sultan's establishment with the consent of its counsel "is evidence in the case and 'may be used alone or with other evidence to support the findings.' " (McCarthy v. City of Manhattan Beach, 41 Cal.2d 879, 889 [264 P.2d 932].)
 [4b] There is substantial evidence that Sultan suffered and permitted its premises to be used not only as a gathering place for homosexuals and sexual perverts but as a place where they openly solicited partners and actually engaged in homosexual practices and sex perversion. The evidence supports the findings of the board that Sultan's business "has been carried on in such a manner as to permit patrons to engage in conduct which is indecent, lewd, lascivious, and prohibited by law" and that it "has been carried on in an unlawful, improper and irregular manner." (Kershaw v. Department of Alcoholic Bev. Control, 155 Cal.App.2d 544 [318 P.2d 494]; Nickola v. Munro, 162 Cal.App.2d 449 [328 P.2d 271].)
 Tarbox v. Board of Supervisors, 163 Cal.App.2d 373 [329 P.2d 553], relied on heavily by Sultan, is not factually analogous. Tarbox operated a motion picture theater under a license from the county. The theater was operated in the same manner as similar theaters in the county are operated. From October 25, 1956, to March 17, 1957, 19 men were arrested in the theater during the showing of pictures on charges of violating Penal Code, section 647, subdivision 5 (vagrancy, lewd). The arrests were based on attempts by the persons arrested to place their hands upon the private parts of members of the sheriff's vice squad, who had seated themselves as decoys. All arrests occurred when the theater was dark for the purpose of exhibiting a picture. It was held that Tarbox did not conduct *198 his theater in any other manner than motion picture theaters are conducted; that he did not countenance, consent to, or in anywise permit any lewd or immoral acts on the premises. We think the distinction between the facts in Tarbox and those at bar is obvious. Men do not run around nude in a theater; they do in Sultan's. There are no cubicles with cots in them in a theater; there are in Sultan's. A motion picture theater must be dark to exhibit pictures. There is no real necessity for Sultan's bath to be dark. A proprietor of a darkened motion picture theater has practically no control over persons watching a picture. Sultan has complete control of its patrons, if it exercises it. The theater was operated as a normal theater. Sultan's bath was not operated as a normal Turkish bath. In Tarbox criminal activity was discovered only by personal conduct of the deviates with the officers. Here the criminal activity was readily observable and could easily have been prevented by adequate control, by removing the doors of the cubicles, or by eliminating the cubicles and providing different facilities for resting.
 [6] Sultan asserts the sole evidence before the board was improperly admitted hearsay. Counsel say the hearing examiner, over Sultan's objection, admitted in evidence the arrest reports and the officers' oral testimony that as to some of those arrested there were convictions in court. Counsel are in error. The only arrest reports to which objection was made were those "in which there is no disposition shown." The officers testified in most instances without objection as to convictions. We think it sufficiently appears they did so of their own knowledge. Such testimony was admissible. (See Vaughn v. Jonas, 31 Cal.2d 586, 594- 596 [191 P.2d 432]; Weiss v. Wasserman, 91 N.H. 164 [15 A.2d 861, 864].) No objection was made to the arrest reports of Officer Catlin. Furthermore, the officers identified their own arrest reports. Section 11513 of the Government Code in part provides:
 "The hearing need not be conducted according to technical rules relating to evidence and witnesses. Any relevant evidence shall be admitted if it is the sort of evidence on which responsible persons are accustomed to rely in the conduct of serious affairs, regardless of the existence of any common law or statutory rule which might make improper the admission of such evidence over objection in civil actions. Hearsay evidence may be used for the purpose of supplementing or explaining any direct evidence but shall not be sufficient in itself to support a finding unless it would be admissible over objection in civil actions." *199
 The record shows that the evidence which was hearsay was used solely for the purpose of supplementing and explaining the direct evidence. (See Cooper v. State Board of Public Health, 102 Cal.App.2d 926, 932 [229 P.2d 27]; Witkin, California Evidence, 12, 10, and cases there collected.)
 [7a] Sultan contends the standard fixed to guide the board in revoking and denying permits, "that such business has been carried on ... in an unlawful, improper or irregular manner," is no standard and that it violates due process. The point is wholly without merit. [8] "The delegation of an absolute legislative discretion to an administrative body is not proper, but if the delegating statute establishes an ascertainable standard to guide the administrative agents no objection can properly be made to it." (Wotton v. Bush, 41 Cal.2d 460, 468 [261 P.2d 256].) [9, 10] The constitutionality of an ordinance must be upheld unless its nullity is clearly apparent, and all presumptions and intendments are in favor of its validity. (Lawton v. Board of Medical Examiners, 143 Cal.App.2d 256, 260-261 [299 P.2d 362].)
 [11] "To comply with the constitutional requirement of due process of law, the crime for which a defendant is being prosecuted must be clearly defined, but it is only necessary that the words used in the statute be well enough known to enable those persons within its reach to understand and correctly apply them. [12] 'To make a statute sufficiently certain to comply with constitutional requirements it is not necessary that it furnish detailed plans and specifications of the acts or conduct prohibited.' [Citation.] [13] Although higher standards of certainty will be required of penal than of civil statutes [citation], a statute is sufficiently certain if it employs words of long usage or with a common law meaning, 'notwithstanding an element of degree in the definition as to which estimates might differ.' [Citations.] For example, the courts have upheld statutes employing such terms as: 'to make diligent effort to find the owner' [citation]; 'unreasonable speed' [citation]; 'unjustifiable physical pain or mental suffering' [citation]; 'practice law' [citation]; and 'to the annoyance of any other person' [citation]." (Lorenson v. Superior Court, 35 Cal.2d 49, 60 [216 P.2d 859].) [14] "Where a statute contains a reasonably adequate disclosure of the legislative intent regarding an evil to be combatted in language giving fair notice of the practices to be avoided, a court will be slow to say that such a statute is too indefinite to be enforced. [15] The complexities of the social *200 problems dealt with by the Legislature require that a practical construction be given to the language employed by the draftsmen of legislation lest their purposes be too easily nullified by overrefined inquiries into the meanings of words. [16] 'Reasonable certainty, in view of the conditions, is all that is required, and liberal effect is always to be given to the legislative intent when possible.' [Citation.] The use of words of general meaning is the essence of our code system." (People v. Deibert, 117 Cal.App.2d 410, 418 [256 P.2d 355].) [17] That is certain which can be made certain by simple reference to the dictionary. (Cozad v. Board of Chiropractic Examiners, 153 Cal.App.2d 249, 257 [314 P.2d 500].) [fn. 1]
 Webster defines "unlawful" as "1. Not lawful; illegal. 2. Irregular; contrary to normal or acceptable procedure; esp. not morally right or conventional. 3. Acting contrary to, or in defiance of, the law; disobeying or disregarding the law." Black defines "unlawful" as "that which is contrary to law or unauthorized by law." Bouvier defines "unlawful" as "that which is contrary to law."
 Webster defines "improper" as "not suited to the circumstances," and gives "indecent" as a synonym. Black and Bouvier both define "improper" as "not suitable; unfit; not suited to the character, time, and place." Bouvier also defines "improper" as "improper conduct is such as a man of ordinary and reasonable care and prudence, under the circumstances, would not have been guilty of."
 Webster defines "irregular" as "Not regular; not according to established law, method, or usage; not conformable to nature, to the rules of moral rectitude, or to established principles; *201 not normal; disorderly." Black and Bouvier define "irregular" as "not according to rule."
 [7b] The standard set by the ordinance is one of conducting the bath in a lawful, proper, and regular manner. This is adequate to apprise those operating such a business of the standard required. The ordinance establishes a sufficiently clear and ascertainable standard.
 Affirmed.
 Wood (Parker), J., concurred.
 SHINN, P. J.
 I concur in the judgment. This controversy could have been resolved by a little mature thinking on one side or the other. Sultan, operating as a combined bathhouse and hotel, serves some 3,500 customers a month; half of them sleep through the night. An exceedingly small proportion of them cause serious trouble and have created an intolerable condition. The findings acquit the managers of knowingly permitting illegal acts upon the premises. There is no basis in the findings or the evidence for attributing to them base motives and evil character, nor is there any such contention. They had a duty to use extreme measures to remedy the condition and they failed in this duty.
 As a result of the surprising lack of common sense in handling the situation the business is to be closed up and a great number of worthy citizens who have need for the beneficent advantage of being steamed out in a Turkish bath will be seriously discommoded. There has never been a doubt of the cause of the trouble and the cure for it. All the management had to do was remove the doors from the sleeping rooms and provide adequate lighting. This it stubbornly refused to do. Upon the other hand, the board should have exercised its power under the city charter to regulate the business. It should have imposed as a condition to the continued operation of the business that the doors of the sleeping rooms be removed and the place well lighted throughout. When a legitimate business is shown to be in need of regulation its operation cannot properly be prohibited if it can be successfully subjected to regulation by the authorities. A public authority which has the power to license businesses, and to regulate them, is remiss in its duties if it permits them to be operated without regulation and exercises only its power to refuse permits or to revoke them. However, in view of the positions taken by the parties in the litigation I do not think it is *202 incumbent upon this court to order the matter to be remanded to the board for further consideration. No doubt there will be an occasion for that at some future time.
NOTES
[fn. 1] 1. See Brecheen v. Riley, 187 Cal. 121 [200 P. 1042], in which the standard "guilty of any act 'which constitutes dishonest dealing' " was held adequate; Dominguez Land Corp. v. Daugherty, 196 Cal. 468, 483-487 [238 P. 703], commissioner of corporations determining whether directors of a corporation shall be permitted to pay dividends from other than surplus profits; Agricultural Prorate Com. v. Superior Court, 5 Cal.2d 550 [55 P.2d 495], committee to determine the method, manner, and extent of prorating agricultural products; Keck v. Superior Court, 109 Cal.App. 251 [293 P. 128], suspend or revoke a driver's license if specified officers find an operator is a reckless, negligent, or incompetent driver; Redevelopment Agency v. Hayes, 122 Cal.App.2d 777, 806 [266 P.2d 105], agency given power to determine whether an area is blighted; Drucker v. State Board of Med. Examiners, 143 Cal.App.2d 702 [300 P.2d 197], words "furnish," "employ," and "maintain" have certain and definite meanings in section 2556 of Business and Professions Code; Kershaw v. Department Alcoholic Beverage Control, 155 Cal.App.2d 544, 549 [318 P.2d 494], "sex pervert." Also see People v. Daniel, 168 Cal.App.2d Supp. 788 [337 P.2d 247], in which a number of illustrations of language held to establish a sufficient standard are given.